# 14-2739-cv

IN THE

## United States Court of Appeals

### FOR THE SECOND CIRCUIT



JULIUS H. SCHOEPS, BRITT-MARIE ENHOERNING,
FLORENCE VON KESSELSTATT,

*Plaintiffs-Appellants,*

*and*

EDELGARD VON LAVERGNE-PEGUILHEN,

*Plaintiff,*

*v.*

FREISTAAT BAYERN OR FREE STATE OF BAVARIA,
A STATE OF THE FEDERAL REPUBLIC OF GERMANY,

*Defendant-Appellee.*

_____

*On Appeal from the United States District Court
for the Southern District of New York (New York City)*

## BRIEF FOR PLAINTIFFS-APPELLANTS
## WITH SPECIAL APPENDIX

John J. Byrne, Jr.
Thomas J. Hamilton
BYRNE GOLDENBERG & HAMILTON, PLLC
*Attorneys for Plaintiffs-Appellants*
1025 Connecticut Avenue, NW, Suite 1012
Washington, DC 20036
202-857-9775

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................vi

PRELIMINARY STATEMENT PURSUANT TO LOCAL RULE 28...................1

JURISDICTIONAL STATEMENT ........................................................................1

STATEMENT OF ISSUES FOR REVIEW ...........................................................2

STATEMENT OF THE CASE................................................................................4

STATEMENT OF FACTS ......................................................................................6

    A.  Bavaria's Purchase of a Stolen Painting – Picasso's *Madame Soler* – From the New York Art Market and Its Refusal to Return It.........................................................................................6

        1.  Bavaria's Challenge in 1959: Its Reputation as a Cultural Center Will Vanish if It Does Not Soon Acquire an Elite Modern Artwork or Two...........................................6

        2.  In October 1963 Martin Arranges for Soehner to Visit the U.S. Expressly To Make Contact With U.S. Dealers and Collectors to Enhance Bavaria's Art Collection ...........................8

        3.  While in New York, Soehner "Cultivate(s) Connections" with Thannhauser to Inquire About Bavaria Buying the Painting and Reaches an Agreement on All Material Terms.........................................................................................9

        4.  The Bavarian Government Reports Contemporaneously That Soehner Reached a Bargain with Thannhauser in New York for the Painting ...............................................11

        5.  Bavarian Newspapers Also Say that Soehner Bargained with Thannhauser for *Madame Soler* in New York...........................12

        6.  The Bavarian Government Recently Has Admitted Twice that Soehner Acquired the Painting from Thannhauser in New York .......................................................................................12

i

7. Soehner Also Inspects the Painting While in New York ................... 13

8. The Parties Seal Their Deal in New York With Informal "Handshake" Commercial Conventions ............................... 14

9. Soehner's First Act as the New BSPC Director Is to Write Thannhauser Expressing His "Gratitude" ............................... 14

10. The August 3, 1964 Written Confirmation of the Deal Reached in New York Makes the Painting's Acknowledged Owner –Thannhauser – an "Agent" For an Unidentified Putative Third Party Seller ................................ 15

11. To Fulfill The Contingency Contract Thannhauser Ships a Stolen Painting from New York to Europe So That Bavaria Can Inspect It Pre-Purchase .................... 17

12. Upon Deciding to Buy *Madame Soler,* Bavaria Expunges From Its Ownership History (Provenance) that Mendelssohn-Bartholdy Ever Owned It...................... 18

13. For Seven Months Soehner (in Munich) and Thannhauser (in New York) Continue Both to Perform and to Renegotiate the Contract by Mail........................................ 19

14. Bavaria Refuses to Pay EBA in Vaduz for the Painting as Both Thannhauser and EBA Demand: Instead Bavaria Mails Payment to Thannhauser at His Gallery in New York ......................................................................... 20

15. Bavaria Denies the Plaintiffs' Claim to Recover *Madame Soler*....................................................................22

16. The District Court Rules that the Plaintiffs' Claims Are "Based Upon" Nazi Germany's Wrongdoing in the 1930's ........................................................................... 23

SUMMARY OF ARGUMENT ........................................................... 24

ARGUMENT ...................................................................................... 29

ii

I.   The District Court Mistakenly Ruled That Plaintiffs' Claims
     Were "Based Upon" the Nazi Dispossession of the Painting
     in the 1930's ....................................................................................29

     A.   The FSIA Seeks to Make Foreign Sovereigns Judicially
          Accountable for Their Purely Commercial Activities ........................29

     B.   The Purpose of the FSIA Is to Afford Judicial Remedies
          to Persons Injured by the Purely Commercial Conduct of
          a Foreign Sovereign That Implicates a Significant U.S.
          Interest .............................................................................................30

     C.   New York Has a Pronounced Governmental Interest
          in Preventing Its Art Market From Becoming an
          International Venue for Stolen Art Transactions ..............................31

     D.   Plaintiffs' Claims Are Integral Both to Bavaria's
          Acquisition of the Painting in New York and to
          New York's "Overarching" Governmental Interest.............................33

     E.   The Court Mistakenly Ruled that the Plaintiffs' Claims
          Were "Based Upon" the Original Nazi Dispossession of
          the Painting from Mendelssohn-Bartholdy in 1934-35......................35

          1.   A plaintiff's claims against a foreign sovereign
               must both be "based upon" the commercial activity
               of the foreign sovereign in the U.S. as well as bear
               a "significant nexus" to this commercial activity ......................35

          2.   The court erred in ruling that the plaintiffs'
               claims were somehow "based upon" the initial
               Nazi dispossession of the Painting in 1934-35 ..........................36

          3.   The conduct of *third parties* cannot be legally
               relevant to deciding FSIA jurisdiction .........................................38

          4.   Plaintiffs satisfy any reasonable judicial
               interpretation of the "significant nexus/
               gravamen" test..............................................................................40

II.  The Court's Findings of Fact Are "Clearly Erroneous" ............................41

A.  The court's findings are premised upon a misapplication
    of law ............................................................................41

B.  The court's findings are against the overwhelming weight
    of evidence and without supporting evidence .....................42

C.  Bavaria has failed to sustain its evidentiary burden for
    asserting sovereign immunity..............................................43

III. Bavaria's Commercial Activities – Upon Which the
    Plaintiffs' Claims Are Based – Created Multiple "Direct
    Effects" in the U.S. That Establish Jurisdiction Under
    §1605(a)(2) .........................................................................43

A.  The Several Legal Requirements for "Direct Effect"
    Jurisdiction .........................................................................43

B.  Bavaria's Legally Significant Commercial Activities in
    Europe Induced Multiple "Direct Effects" in the U.S.
    Upon Which the Claims of the Plaintiffs Are Based ...........46

    1.  The Confirmation caused Thannhauser to ship a
        stolen painting from New York into international
        commerce .....................................................................46

    2.  Through the Confirmation Bavaria purchased
        property in the U.S. through a U.S. person ...................48

    3.  Through the Confirmation Bavaria enabled
        Thannhauser to evade U.S. taxes..................................48

    4.  Bavaria's extensive correspondence with Soehner in
        New York as the sale progresses causes Thannhauser
        to respond by U.S. mail ................................................50

    5.  Bavaria's bargained-for payment to Thannhauser in
        New York created a "direct effect" in the U.S. that
        the Court consistently has acknowledged ....................50

6.    Bavaria's refusal to return the Painting in 2010
fulfilled under New York law the discrete elements
of the Plaintiffs' several causes of action ...................52

IV.   Plaintiffs' Claims Are "Based Upon" the Commercial
Activity of Bavaria in New York Sufficient To Establish
Jurisdiction Under the First Prong of §1605(a)(2) .....................54

A.   The Requirements for Asserting Jurisdiction "Based
Upon" the Commercial Activity of a Foreign Sovereign
in the U.S. ...............................................................................54

B.   The Commercial Activities of Bavaria in Acquiring
the Painting Have "Substantial Contact" with the U.S
in Two Ways ...........................................................................55

1.    Bavaria Purchased the Painting from a U.S. concern
or person – Thannhauser ..............................................55

2.    Bavaria's acquisition of the Painting impaired
several important U.S. and New York governmental
interests ..........................................................................56

C.   The Plaintiffs' Claims Are "Based Upon" the
Commercial Activity of Bavaria in the U.S. .........................56

1.    Plaintiffs' Conversion Claim Is "Based Upon"
the Commercial Activities of Bavaria in
New York in Acquiring the Painting............................56

2.    Plaintiffs' Equitable Claims and for Declaratory
Relief Are "Based Upon" the Commercial Activities
of Bavaria in Acquiring the Painting in New York....................65

V.    The District Court Failed to Address Whether Jurisdiction
Attaches Over Plaintiffs' Other Claims Including for Unjust
Enrichment, Constructive Trust and Declaratory Relief...........................66

CONCLUSION...................................................................................67

CERTIFICATE OF COMPLIANCE.....................................................69

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Antares Aircraft, L.P. v. Federal Republic of Nigeria*, 999 F.2d 33
(2d Cir. 1993) ...........................................................................40, 50

*Adler v. Federal Republic of Nigeria*, 219 F.3d 869 (9th Cir. 2000) ......................50

*Bakalar v. Vavra*, 619 F.3d 136 (2d Cir. 2010) ..................................................*passim*

*Counihan v. Allstate Ins. Co.*, 194 F.3d 357 (2d Cir.1999) ....................................66

*De Csepel v Republic of Hungary*, 714 F.3d 591 ( D.C. Cir. 2013)........................35

*Doe v. Holy See*, 557 F.3d 1066 (9th Cir. 2009)......................................................66

*Ehrenfield v. Bin Mahfouz*, 881 N.E.2d 830 (N.Y. 2007) ......................................45

*Ehrlich-Bober & Co. Inc. v. University of Houston*, 404 N.E.2d 726
(N.Y. 1980) ............................................................................................41

*Fliegler v. Commissioner of Social Security*, 117 Fed. Appx. 213
(3d Cir. 2004) .......................................................................................52

*Garb v. Republic of Poland*, 440 F.3d 579 (2d Cir. 2006) .............................*passim*

*Gillet v. Roberts*, 57 N.Y. 28 (N.Y. 1874)......................................................57, 66

*Goodman v. Port Authority of New York and New Jersey*,
850 F. Supp.2d 363 (S.D.N.Y. 2012)................................................58

*Gregory v. Helvering*  293 U.S. 465 (1935) .............................................................49

*Guirlando v. T.C. Ziraat Bankasi A.S.,* 602 F.3d 69 (2d Cir. 2010)................40, 44

*Hannil Bank*, 148 F.3d 127 (2d Cir. 1998) ...............................................................50

*In re Koreag, Controle et Revision S.A. v. Refco F/X Assoc., Inc.*,
961 F.2d 341 (2d Cir.1992)..................................................................66

*Intel Corp. and Dell Inc. v. Commonwealth Scientific*, 455 F.3d 1364..................35

*Int'l Hous. Ltd. v. Rafidain Bank Iraq*, 893 F.2d 8 (2d Cir. 1989) .........................50

*Israel Discount Bank Limited v. Rosen*, 452 N.E.2d 1213 (N.Y. 1983).................41

*Joseph v. Office of the Consulate Gen. of Nigeria*, 830 F.2d 1018
    (9th Cir.1987). ....................................................................................66, 67

*Kensington International Limited v. Itoua*, 505 F.3d 147
    (2d Cir. 2007) ..........................................................................35, 36, 40, 44

*Lenard v. Design Studio*, 889 F. Supp.2d. 518 (S.D.N.Y. 2012) ...........................57

*Lopresti v. Terwilliger*, 126 F.3d 34 (2d Cir. 1997) ...............................................57

*Lubin v. Commissioner of Internal Revenue*, 335 F. 2d 209
    (2d Cir. 1964) ..................................................................................................49

*Mandarin Trading Ltd. v. Wildenstein*, 944 N.E.2d 1104 (N.Y.2011).............34, 65

*McCall v. Astrue*, 2008 WL 5378121 (S.D.N.Y. 2008) .......................................52

*Menzel v. List*, 246 N.E.2d 742 (N.Y. 1969) .........................................................33

*Ministry of Supply. Cairo v Universe Tankships, Inc.*, 708 F.2d 80
    (2d Cir. 1982) ..................................................................................................55

*Newbro v. Freed*, 2007 WL 642941 (2d Cir. 2007) ...................................34, 47, 57

*Pacific M. International Corp. v. Raman International Gems, Ltd.*,
    888 F. Supp.2d 385 (S.D.N.Y. 2012)................................................................58

*Republic of Argentina v. Weltover,* 504 U.S. 607 (1992) ...............................*passim*

*Rogers v. Richmond*, 365 U.S. 534 (1961) .............................................................42

*Saudi Arabia v. Nelson*, 507 U.S. 349 (1993) ..................................................*passim*

*Schoeps v. Bayern*, 2014 WL 2915894 (S.D.N.Y. June 27, 2014)..................*passim*

*Servaas, Inc. v. Republic of Iraq*, 2011 WL 454501 (2d Cir. 2011) ....................48

*Shapiro v. Bolivia*, 930 F.2d 1013 (2d Cir. 1991) ...........................................31, 56

*Sharp v. Kosmalski*, 351 N.E.2d 721 (N.Y. 1976)........................................65

*Simonds v. Simonds*, 380 N.E. 2d 189 (N.Y. 1978)....................................34

*Solomon R. Guggenheim Foundation v. Lubell*, 569 N.E.2d 426 (N.Y. 1991) ................................................................................31, 32

*Spies v. United States*, 317 U.S. 492 (1934) ...........................................48

*State v. Seventh Regiment Fund, Inc.*, 774 N.E.2d 702 (N.Y. 2002).....................57

*Stone v. Williams*, 970 F.2d 1043 (2d Cir.1992)......................................65

*Swarna v. Al-Awadi*, 622 F.3d 123 (2d Cir. 2010) ...................................43

*Texas Trading & Milling Corp v. Federal Republic of Nigeria*, 647 F.2d 300(2d Cir. 1981), *overruled on other grounds by Frontera Resources Azerbaijan Corp. v. State Oil Co. of Azerbaijan Republic*, 582 F.3d 393 (2d Cir. 2009)...............................30, 45

*United States Fidelity and Guaranty Company v. Braspetro Oil Services*, 199 F.3d 94 (2d Cir. 1999) ...........................................52, 53

*United States v. Majors*, 196 F.3d 1206 (7th Cir. 1999) ...........................49

*United States v. United States Gypsum Co.*, 333 U.S. 364 (1948) ......................42

*Weltover v. Republic of Argentina*, 941 F.2d 145 (2d Cir. 1991)...............29, 31, 41

## Statutes

18 U.S.C. §§ 2314-15 (1948)..............................................................46

28 U.S.C. § 1291 ..........................................................................2

28 U.S.C. § 1330(a) .......................................................................1

28 U.S.C. § 1602 et seq. (1976)....................................................*passim*

28 U.S.C. § 1605(a)(2).....................................................................1

26 U.S.C. § 7201 (1954) ...................................................................48, 56

CPLR § 302(a)(1).........................................................................45

**Rules**

Fed. R. App. P. 4(a)(1)...................................................................2

Fed. R. Civ. P. 12 (b)(1)................................................................5

**Other Authorities**

9 Wm. J. Moore, et al., *Moore's Federal Practice*, §52.31[4]
    (3d ed. 2013) ........................................................................41

Arthur Acevedo, *Abusive Tax Practices: The 100-Year Onslaught on
    the Tax Code*, 17 Barry L. Rev. 179 (2012)........................................49

Erhard Goepel, *Picasso's million mark woman: The portrait of
    Madame Soler can be admired in the House of Art in Munich*,
    December 22, 1964 ............................................................*passim*

Helmut Engelhardt, *The Odyssey of Picasso's Madame Soler*,
    Bayern Kurier, January 16, 1965 .............................................12, 18

M. Saltzman, *IRS Practice and Procedure* § 7A.02 (2013). ...................49

Marilyn E. Phelan, *Scope of Due Diligence Investigation in Obtaining
    Title to Valuable Artworks,* 23 Seattle U. L. Rev. 633 (2000) ...............57

*New York Times* article entitled *Guggenheim Gets Major Art Works*.....................8

U.S. H.R. REP. 94-1487, 94th Cong.2d Sess. 1976,
    1976 U.S.C.C.A.N.6604, 6605. ...............................................31

U.S. H.R. REP. 94-1487, 94th Cong.2nd Sess. 1976,
    1976 U.S.C.C.A.N. 6604, 6617 ..............................................53

**PRELIMINARY STATEMENT PURSUANT TO LOCAL RULE 28**

This is an appeal from the opinion and order of the Honorable Jed S. Rakoff, United States District Judge for the Southern District of New York, reported at 2014 WL 2915894 (S.D.N.Y. June 27, 2014)(Op.), and the Judgment dismissing the case entered on June 30, 2014.

**JURISDICTIONAL STATEMENT**

U.S. citizen Britt-Marie Enhoerning and others (plaintiffs) appeal from a ruling denying jurisdiction under the Foreign Sovereign Immunities Act (FSIA), 28 U.S.C. §§ 1602 *et seq.* (1976) over an action to recover a Picasso painting (Painting) that the plaintiffs' Jewish ancestor lost in Nazi Germany. The Free State of Bavaria (Bavaria) purchased the Painting in New York in 1964-65, and refused to return it in 2010. Plaintiffs assert that the District Court misapplied the "commercial activities exception" of the FSIA (§ 1605(a)(2)) – which denies sovereign immunity for the purely commercial activities of foreign sovereigns – in declining jurisdiction over their claims. Jurisdiction in the District Court attaches under 28 U.S.C. § 1330(a) if the Court concludes that the plaintiffs' claims come within § 1605(a)(2). This appeal addresses whether the commercial activity exception applies.

Plaintiffs maintain that jurisdiction exists under the first prong of § 1605(a)(2) because Bavaria's commercial activities in acquiring the Painting in

1964-65 had "substantial contact" with New York within the meaning of this statute, and plaintiffs' claims to recover the Painting are "based upon" these commercial activities within the meaning of *Saudi Arabia v. Nelson*.[1] Jurisdiction exists under the third prong of § 1605(a)(2) because the commercial activities of Bavaria outside the U.S. both in acquiring and refusing to return the Painting had multiple "direct effects" in the U.S. within the meaning of *Republic of Argentina v. Weltover*.[2]

The Second Circuit has jurisdiction over this appeal because it is from a final judgment dismissing this action. *See* 28 U.S.C. § 1291.

The District Court entered Judgment dismissing this case on June 30, 2014. Plaintiff filed a timely notice of appeal on July 25, 2014 – within 30 days of the dismissal as Fed. R. App. P. 4(a)(1) requires.

As noted, this is an appeal from a final order of dismissal.

**STATEMENT OF ISSUES FOR REVIEW**

A. The FSIA seeks to hold foreign sovereigns judicially accountable for their purely commercial activities to the same degree as private parties.

Accordingly, § 1605(a)(2) suspends immunity when the claim of a plaintiff is "based upon" the commercial activity of a foreign sovereign.[3] So the

---

[1] 507 U.S. 349, 357 (1993).
[2] 504 U.S. 607, 618 (1992).
[3] *Saudi Arabia v. Nelson,* 504 U.S. 607, 618 (1992).

2

"threshold step" for a court in assessing whether FSIA jurisdiction attaches under § 1605(a)(2) is to identify the acts of the foreign sovereign defendant that serve as the basis for a plaintiff's claim, that is, what the plaintiff's claim is "based upon" within the meaning of this statute.[4]

In this case, however, the court ruled that the plaintiffs' claims were not "based upon" the commercial activities of Bavaria in acquiring the Painting in 1964-65, or upon its refusal to return the Painting to plaintiffs in 2010. Rather, the court ruled instead that plaintiffs' claims were "based upon" the remote historical conduct of a third party – Nazi Germany – in forcing the plaintiffs' predecessor to relinquish the Painting in the 1930's.

Did the court err in ruling that the plaintiffs' claims against Bavaria were "based upon" Nazi wrongdoing in the 1930's?

B. A finding of fact is "clearly erroneous" as a matter of law when premised upon a mistaken legal standard. The court misconstrued § 1605(a)(2) by ruling that plaintiffs' claims were "based upon" Nazi wrongdoing in the 1930's.

Are the court's findings of fact "clearly erroneous"?

C. Bavaria went to New York to buy the Painting, negotiated all material terms of its contract in New York, had the Painting shipped from New York to

---

[4] *Garb v. Republic of Poland,* 440 F.3d 579, 586 (2d Cir. 2006).

3

Europe, continued to correspond with its art dealer in New York regarding contract performance and payment, and sent payment to New York.

Did the court err in ruling that plaintiffs failed to establish jurisdiction over Bavaria under § 1605(a)(2)?

D. Section 1605(a)(2) requires that courts evaluate jurisdiction separately for each discrete FSIA claim. The court purported to address the plaintiffs' claim for conversion, but neglected to consider its other claims including for unjust enrichment, constructive trust, equitable estoppel and declaratory relief.

Did the court err in failing to address plaintiffs' additional claims?

**STATEMENT OF THE CASE**

This appeal is from a ruling dismissing a claim by the plaintiffs to recover a painting by Pablo Picasso entitled *Madame Soler*, oil on canvas 1903 (Painting) from Bavaria. The District Court dismissed this action on grounds that it lacked subject matter jurisdiction under § 1605(a)(2).

Plaintiffs are the descendants and heirs of the late Jewish Berlin banker Paul von Mendelssohn-Bartholdy (Mendelssohn-Bartholdy) who lost the Painting in a paradigmatic "forced transfer" in 1935 as a proximate result of intensifying Nazi persecution that devastated him financially. Mendelssohn consigned the Painting under duress to Berlin art dealer Justin Thannhauser (Thannhauser) in 1934. After

4

Mendelssohn-Bartholdy died in May 1935, Thannhauser embezzled the Painting from his unaware widow.

In 1964, a Bavarian official traveled to New York to negotiate the purchase of the Painting from Thannhauser and there agreed upon all material terms of the parties' bargain. Thannhauser later shipped the Painting from New York to Bavaria to fulfill their contract. In 2010, Bavaria refused to return the Painting after plaintiffs established the foregoing.

The Second Amended Complaint (SAC) alleges claims to recover the Painting including conversion, restitution based upon unjust enrichment, constructive trust, and declaratory relief. On November 26, 2013 Bavaria moved to dismiss this action under Fed. R. Civ. P. 12 (b)(1) for lack of subject matter jurisdiction. The District Court heard initial argument on December 23, 2013, and held an evidentiary hearing on February 28, 2014, March 4, 2014, and March 18, 2014. On June 27, 2014 it issued an opinion and order dismissing the case and on June 30, 2014 entered judgment.

The District Court erred by misapplying the pivotal term "based upon" of § 1605(a)(2) to conclude that plaintiffs' claims were "based upon" the original Nazi dispossession of the Painting in 1934-35, rather than upon Bavaria's negligent acquisition of the Painting in New York in 1964-65 and its later wrongful refusal to return it. This misinterpretation skewed the court's jurisdictional analysis

making irrelevant Bavaria's extensive commercial activities in and affecting New York in acquiring the Painting, as well as its affront to a paramount New York governmental interest seeking to protect the commercial integrity of its art market. The court also ignored the many consequential "direct effects" that Bavaria's commercial activities outside the U.S. had in New York. Because the court's ruling is premised upon legal error its findings of fact are "clearly erroneous". The court's findings also are "clearly erroneous" because they are against the overwhelming weight of evidence in most instances and contrary to the evidence in others.

Bavaria's own documents establish jurisdiction under § 1605(a)(2) and this Court should so rule as a matter of law.

## STATEMENT OF FACTS

### A. Bavaria's Purchase of a Stolen Painting – Picasso's *Madame Soler* – From the New York Art Market and Its Refusal to Return It

#### 1. Bavaria's Challenge in 1959: Its Reputation as a Cultural Center Will Vanish if It Does Not Soon Acquire an Elite Modern Artwork or Two

In May 1959 BSPC Director Kurt Martin writes the Bavarian Ministry of Instruction and Religion admonishing that if Bavaria does not soon acquire a few preeminent modern artworks – such as by Pablo Picasso – "Munich's international reputation and fame as a city of art ...will be irretrievably lost."[5] Nazi policies

---

[5] A-788.

have deprived the BSPC of modern art [6], and Bavaria's collection lags far behind other German cities.[7]

Rapidly escalating prices for premium modern artworks and their limited availability amplify Bavaria's predicament.[8] Wealthy U.S. museums and private collectors are driving up prices.[9] Plaintiffs' expert witness – Dr. Jonathan Petropoulos – testified that "[t]hey really need a Picasso very badly."[10]

In late 1963, a 44 year old former Nazi and senior curator for the BSPC with a driving ambition to expand its art collection named Halldor Soehner is envisioned to succeed Martin as Director.[11] Soehner is known for "the uncommon dynamics of his character, his breathtaking energy and his unmatched personal ambitions."[12] "He was striving for the highest quality, he used to say 'top paintings', famous names in art."[13] And because Soehner had a special expertise in Spanish painting, "it was a logical consequence that his first acquisition…was a

---

[6] *Id*.
[7] A-790.
[8] A-791.
[9] *Id*.
[10] A-336.
[11] A-807; A-812.
[12] A-769.
[13] *Id*.

Spanish painting by Picasso."[14]  "Soehner was obsessed with his goals and sometimes this obsession carried him too far."[15]

**2. In October 1963 Martin Arranges for Soehner to Visit the U.S. Expressly To Make Contact With U.S. Dealers and Collectors to Enhance Bavaria's Art Collection**

In October 1963, Martin persuades a private foundation to fund a trip for Soehner to the U.S. the following year to visit U.S. museums.[16]  The trip will enable Soehner to see how U.S. museums operate.[17] Martin explains that "Dr. Soehner would also like to use this trip in order to visit a series of US museums, private collectors, and dealers, and by doing so, make discoveries that will enhance the scholarly catalogues of the Pinakothek …"[18]  The court volunteered that "[y]ou couldn't enhance the catalogue if you didn't have the picture, could you?"[19]

Also in October 1963, a front page *New York Times* article entitled *Guggenheim Gets Major Art Works*[20] reports that Thannhauser has gifted 34 Picasso artworks to the Guggenheim. Dr. Petropoulos testified that "there would

---

[14] *Id.*
[15] *Id.*
[16] A-805-814.
[17] A-812-813.
[18] A-824.
[19] A-354.
[20] A-818-820.

have been clear, ample opportunity for Soehner to be apprised of this spectacular gift by Thannhauser."[21]

A German newspaper reports that Soehner "searched the American continent for an early painting by Picasso", and "visited 70 year old Justin Thannhauser in New York."[22]

### 3. While in New York, Soehner "Cultivate(s) Connections" with Thannhauser to Inquire About Bavaria Buying the Painting and Reaches an Agreement on All Material Terms

Sometime in April or May 1964, Soehner visits Thannhauser for several hours at his gallery apartment at 12 East 67th Street (gallery), and signs Thannhauser's guest register.[23]  *Madame Soler* and *Rouart* hang next to each other at the gallery.[24]  Soehner there convinces Thannhauser to sell Bavaria both paintings (paintings). [25]  In addition, Soehner inspects them and agrees upon price and terms, as discussed below.

On November 11, 1964, Soehner writes to the Ministry of Culture explaining how he had obtained this opportunity.[26] Soehner recounts that while in New York the previous spring he had "cultivated connections" to Thannhauser and

---

[21] A-359.
[22] A-986.
[23] A-828-829.
[24] A-830; A-384.
[25] A-958; A-963.
[26] A-957-958.

had asked him to sell both paintings to Bavaria. Thannhauser acceded to the request, and offered generous payment terms:

> During my trip to America, in the Spring of 1964, I cultivated connections to Mr. Thannhauser, who is a native of Munich who first became acquainted with the great masters of 20th century painting in 1910 through exhibitions in Munich, who was forced to emigrate from the Third Reich: he then settled in New York. Since he was involved in those days in the building of Munich's collection of Impressionists under Hugo von Tschudi, I asked him to remember his home town and sell two of his paintings, whose quality is so unusually high that their like is no longer encountered on the art market, to Munich's State Paintings Collections. Mr. Thannhauser has already given a major portion of his collection to the Guggenheim Museum in New York and is, at his age, he is well beyond 70 years old – concerned about the fate of his masterpieces. Thus, he decided to offer the pictures by Degas and Picasso to Munich. The payment terms he imposed – he said he agreed to settlement in the years 1965/1966, and was even prepared to receive the final payment on 1/31/67, without any interest – prove that he would rather know that his paintings were in a place worthy of them than making good business deals with them.[27]

The court viewed Soehner's memorandum as confirming that he had negotiated with Thannhauser in New York. "I see a proposal by Thannhauser, according to this account I see what looks like some haggling over the payment terms…"[28] "He [Soehner] says, I negotiated with this guy…But in any event he

---

[27] A-958.
[28] A-447.

convinced Thannhauser to offer these for sale."[29]  "[I]t shows that he had discussions about this with Mr. Thannhauser in New York."[30]

### 4. The Bavarian Government Reports Contemporaneously That Soehner Reached a Bargain with Thannhauser in New York for the Painting

The next day, November 12, 1965, the BSPC – of which Soehner then was Director – writes to the Ministry of State reaffirming that Soehner secured this opportunity when he visited Thannhauser in New York: "[b]oth pictures are being offered for sale by the well-known collector J.K. Thannhauser in New York…who offered both pictures to the Director General, Dr. Soehner on the occasion of the latter's recent trip to America, when the latter asked for both pictures…"[31]

In December 1964, a ranking Bavarian official writes to the State Ministry of Finance also relating that Soehner had arranged for Bavaria to purchase *Rouart* when he visited Thannhauser in New York earlier that year: "Dr. Halldor Soehner…visited Mr. Thannhauser during his trip to America in the spring of 1964 and asked him to offer this painting to the State Painting Collections."[32]

---

[29] A-290.
[30] A-289.
[31] A-963.
[32] A-990.

11

### 5. Bavarian Newspapers Also Say that Soehner Bargained with Thannhauser for *Madame Soler* in New York

A December 22, 1964 Munich newspaper recounts that Soehner had acquired the opportunity for Bavaria to buy the Painting when – after searching exhaustively – he visited Thannhauser the previous Spring in New York, and asked him to sell the Painting.[33] Dr. Petropoulos commented that Soehner then was in charge of media relations for the BSPC, and that this article appears to celebrate his initiative.[34] A January 16, 1965 article in the *Bayern-Kurier* entitled *The Odyssey of Picasso's Madame Soler* also reports that while in New York Soehner had procured the opportunity for Bavaria to buy the Painting. [35]

Dr. Petropoulos pointed out that Soehner – who then was both Director and in charge of BSPC media relations – never corrected this consistent narrative.[36]

### 6. The Bavarian Government Recently Has Admitted Twice that Soehner Acquired the Painting from Thannhauser in New York

Bavaria twice has acknowledged that Soehner bought the Painting from Thannhauser in New York in 1964. In its letter of March 31, 2010 denying plaintiffs' claim Bavaria stated:

---

[33] A-986.
[34] A-404-405.
[35] A-1000.
[36] A-446.

> 1964: Purchase of Picasso's *Madame Soler* for 1.6 million DM…in the knowledge of the Mendelssohn provenance **at Justin K. Thannhauser's in New York.**[37] (Italics and emphasis added).

And on October 17, 2011 the BSPC issued a press statement entitled "Statement of the General Director of the Bavarian State Painting Collection on the Purchase of 'Madame Soler' by Picasso" which related:

> In 1964, with significant public attention, the Bavarian State Painting Collection purchased two paintings for the new State gallery: Pablo Picasso's "Madame Soler" of 1903…**The sale took place at the Jewish art dealer's, Justin K. Thannhauser (1892-1976) in New York**."[38] (Italics and emphasis added).

The court declared that this statement was "clearly an admission by a party adversary. But why shouldn't it be given substantial weight under the circumstances under which it was issued."[39] The court said further that the BSPC "had no question as to the accuracy of Dr. Soehner's memorandum regarding the circumstances under which he acquired these paintings. I think...that's quite a lot, if I accept that."[40]

### 7. Soehner Also Inspects the Painting While in New York

Dr. Petropoulos testified that Soehner also necessarily physically inspected the Painting in New York before agreeing to buy it.[41] Inspecting paintings pre-purchase is essential. Dr. Petropoulos said that Soehner must have done so because

---

[37] A-1085.
[38] A-1094.
[39] A-412-413.
[40] A-415.
[41] A-448.

13

the record contains no evidence that Soehner saw either painting at any other time before Thannhauser shipped them to Munich.[42]

### 8. The Parties Seal Their Deal in New York With Informal "Handshake" Commercial Conventions

Dr. Petropoulos testified that the contemporaneous commercial conventions of the international art market were informal – and that bargains viewed as binding were struck with a handshake that conveyed an implied word of honor.[43]

### 9. Soehner's First Act as the New BSPC Director Is to Write Thannhauser Expressing His "Gratitude"

When Soehner becomes Director on July 1, 1964,[44] he writes Thannhauser advising that his first action is to express his appreciation: "[t]oday I entered my new position, and my first action is this letter to you; I hope my gratitude is palpable from my words."[45] The court observed "[i]s it not arguably of significance that his very first action is a letter to Mr. Thannhauser suggesting perhaps that that meeting [at Thannhauser's New York apartment gallery] was not just a casual inquiry?"[46]

The July 1 letter relates Soehner's interest in meeting Thannhauser soon. The Court inquired of Bavaria's expert German law witness (Dr. Rolf Poscher)

---

[42] A-426; A-432-433.
[43] A-443-444.
[44] A-838.
[45] A-838.
[46] A-321.

whether a "fair reading" of the July 1, 1964 letter would be Soehner saying that "I can't really do anything until I'm Director General but now I'm Director General, I really want to go forward on this, so my very first letter is to you. Isn't that a fair reading of that?"[47] Dr. Poscher agreed.

On July 22, 1964 Soehner writes to the Bavarian State Ministry for Culture seeking permission to travel to Cap Ferrat, France in August to conduct "important negotiations" with the "art trade…concerning future purchases for the Bavarian State Paintings Collections."[48] Professor Petropoulos testified that this letter was consistent with Soehner and Thannhauser having reached the material terms of their bargain in New York while intending to finalize it in France.[49]

**10.The August 3, 1964 Written Confirmation of the Deal Reached in New York Makes the Painting's Acknowledged Owner –Thannhauser – an "Agent" For an Unidentified Putative Third Party Seller**

On August 3, 1964 Soehner travels to Cap Ferrat where he countersigns with Thannhauser a document dated August 3, 1964 typed on the stationery of the Hôtel Intercontinental Genève (Confirmation).[50] The Confirmation states that Thannhauser had acquired the Painting on behalf of the BSPC "as agent."[51]

---

[47] A-633-634.
[48] A-841.
[49] A-465.
[50] A-907.
[51] A-907.

Dr. Petropoulos said that the Confirmation evinced four suspicious indicia: (1) Soehner knew that Thannhauser owned the Painting but nonetheless signed a contract in which Thannhauser purported to act as an "agent" for a fictive and unidentified third party seller; (2) the Confirmation required that Bavaria pay for the Painting in Swiss currency; (3) the Confirmation was written on Hôtel Intercontinental Genève (Hotel) stationery; and (4) the Confirmation was typed on a German typewriter although the parties met in France.[52]   Dr. Petropoulos said that he believed that Thannhauser typed the Confirmation at the Hotel before meeting Soehner in Cap Ferrat.[53]   The court agreed: "[y]ou're going to have a hard row to hoe to convince me that it was typed anywhere but at the Hotel Intercontinental. Who puts a letter like this on hotel stationary unless you are in the hotel and don't have anything better?"[54]

The court found that Thannhauser's role as an agent to be "problematic."[55] Bavaria acknowledged that Thannhauser ultimately acts as an agent for a Liechtenstein entity known as *Etablissement Les Beaux Arts* (EBA) which the Confirmation did not identify.[56]   EBA was founded in 1957 to "facilitate"

---

[52] A-426-427.
[53] A-428.
[54] A-429.
[55] A-425.
[56] A-515.

international art transactions.[57]  But EBA does not appear until October 27, 1964 when it sends Soehner a letter notifying him that the "paintings" had shipped from Zurich.[58] Bavaria acknowledges that EBA was never the owner or seller of the Painting.[59] The court opined that "I think this whole business about this Liechtenstein company...just reeks of being a charade."[60]  The court twice asked Bavaria whether if it knew that Thannhauser was using EBA for "tax evasion purposes" that knowledge would trigger one of the FSIA commercial activity exceptions.[61]

### 11. To Fulfill The Contingency Contract Thannhauser Ships a Stolen Painting from New York to Europe So That Bavaria Can Inspect It Pre-Purchase

By October 16, 1964, Thannhauser has shipped both paintings to Europe.[62] Dr. Petropoulos testified that he had seen no evidence that *Madame Soler* ever was in Europe during the preceding 25 years.[63]  Dr. Petropoulos testified: "just to be clear…the paintings left New York only as a result of the agreement that Soehner

---

[57] A-763.
[58] A-928.
[59] A-323; A-375.
[60] A-458.
[61] A-327-328; A-555.
[62] A-912.
[63] A-437.

17

and Thannhauser had reached. They would not have left New York unless they had an agreement."[64]  The court acknowledged plaintiffs' argument that "the painting was…shipped from New York"[65], and asked Bavaria "[h]ow did it get to Switzerland?"[66]

### 12. Upon Deciding to Buy *Madame Soler,* Bavaria Expunges From Its Ownership History (Provenance) that Mendelssohn-Bartholdy Ever Owned It

Bavaria acknowledges that it bought the Painting knowing that Mendelssohn-Bartholdy had owned it.[67]  Thannhauser later sends it two written provenances identifying Mendelssohn-Bartholdy as a former owner. [68]

After the Bavarian government approves the purchase of the Painting in December 1965 two Bavarian newspapers publish a fictive provenance that deletes Mendelssohn-Bartholdy and maintains that the Thannhauser family exclusively had owned the Painting throughout the 1930's.  *See* Erhard Goepel, *Picasso's million mark woman: The portrait of Madame Soler can be admired in the House of Art in Munich*, December 22, 1964"[69],  and Helmut Engelhardt, *The Odyssey of Picasso's Madame Soler*, Bayern Kurier, January 16, 1965."[70]  The record does not

---

[64] A-482.
[65] A-319.
[66] A-325.
[67] A-1085.
[68] A-915; A-981.
[69] A-986.
[70] A-1000.

disclose the source of this false narrative. But former Nazi party member Halldor Soehner was then the Director of the BSPC, the resident BSPC expert in Spanish paintings, the official who had gone to New York to negotiate for the Painting and who had contracted and corresponded with Thannhauser, as well as in charge of media relations for the BSPC.

### 13. For Seven Months Soehner (in Munich) and Thannhauser (in New York) Continue Both to Perform and to Renegotiate the Contract by Mail

Between October 1964 and May 1965 (when Bavaria pays Thannhauser for the Painting), Soehner and Thannhauser correspond about 20 times concerning Bavaria's progress in approving the sale and how – and whom – Bavaria will pay for the Painting. Soehner addresses letters to Thannhauser in New York which declare Bavaria's intention to buy the Painting, the performance of both parties under the Confirmation, and that renegotiate the terms of payment. These letters elicit responses from Thannhauser invoking the U.S. and international mail. Soehner's letters to Thannhauser include Pl. Exhs. 55, 60, 64, 74, 79, 82, 87, 89, 90, and 92, and Thannhauser's responses to Soehner include Pl. Exhs. 56, 57, 71, 75, 83.[71]

---

[71] A-908-926; A-934-936; A-966-968; A-981; A-992-997; A-1007-1009; A-1020-1025; A-1037-1039; A-1044-1046; A-1047-1049; A-1394-1395.

### 14. Bavaria Refuses to Pay EBA in Vaduz for the Painting as Both Thannhauser and EBA Demand: Instead Bavaria Mails Payment to Thannhauser at His Gallery in New York

On December 30, 1964 Soehner writes Thannhauser advising that Bavaria has approved the purchase of the Painting.[72] Soehner expresses Bavaria's concern about Thannhauser's role as "commission agent", and insists upon clarifying this ambiguity.[73]

Bavaria balks at the requests both of Bavaria and EBA to wire payment to EBA in Vaduz.[74] Bavaria instead decides to issue a deposit-only check drawn on its account with the Bavarian State Bank (Bank) and made out to Thannhauser personally at the address of his New York gallery.[75] Bavaria reaffirms that once Thannhauser has this check he can direct the Bank to pay anyone that he chooses – including EBA.[76] On March 3, 1965 Soehner writes Thannhauser in New York that the check "could be sent to you shortly."[77] Thannhauser accepts this arrangement.[78]

On April 28, Finance Minister Poehner instructs the Treasury Department to pay Thannhauser at his address in New York "*via* the Bavarian State Bank,

---

[72] A-993.

[73] *Id*.

[74] A-996; A-1002.

[75] A-1006.

[76] A-1027; A-1030.

[77] A-1021.

[78] A-1024.

Munich" (emphasis and italics added), and to arrange with the Bank both to issue and *to transfer* the check to Thannhauser at his New York address, noting that Thannhauser had agreed to accept payment in this manner.[79]

Both the court and Bavaria concurred that Bavaria had paid Thannhauser for the Painting in New York. The court said "[s]o that looks pretty clear that the payment was made in New York."[80] Bavaria agreed that it had paid Thannhauser in New York, but argued that it had done so at its own "specific request", as both Thannhauser and EBA "had demanded" at all times that payment be made to Liechtenstein.[81] Bavaria, however, later reversed its position.

On April 28, 1965, Finance Minister Poehner writes Soehner requesting that Soehner notify Thannhauser of payment "by sending a copy of the payment order as confirmation of the conclusion of the purchase and the conveyance of the Painting."[82]

On May 10, 1965 Soehner writes Thannhauser in New York enclosing a copy of the payment order of April 28, 1965 that prescribes that the Bank will transmit the check to him in New York. The letter states that "[t]he payment of the

---

[79] A-1034-1035.
[80] A-287.
[81] A-299-300.
[82] A-1030.

sum will be made to the Etablissement "Les Beaux Arts" in Vaduz, as requested".[83]

On June 1, 1965 EBA writes Soehner informing him that it had received payment for the Painting and enclosing an irregular gratuity of 40,000 Swiss francs which Dr. Petropoulos identified as likely a reward for helping Thannhauser evade taxes.[84]

### 15. Bavaria Denies the Plaintiffs' Claim to Recover *Madame Soler*

On August 9, 2009 plaintiffs – relying upon Bavaria's assurances that it would decide their claim to recover the Painting fairly and according to an historical presumption in their favor – submitted a claim to recover *Madame Soler*. On March 31, 2010 Bavaria denied their claim.[85]  Bavaria later refused plaintiffs' request to submit their claim to a special commission in Germany formed to review claims against German museums in possession of alleged Nazi-era artworks, thereby exhausting their remedies in Germany.[86]

---

[83] A-1039.
[84] A-1052; A-536-537.
[85] A-104; A-1087.
[86] A-105-106.

22

### 16. The District Court Rules that the Plaintiffs' Claims Are "Based Upon" Nazi Germany's Wrongdoing in the 1930's

On June 27, 2014 the court dismissed the plaintiffs' claims for lack of subject matter jurisdiction. *Schoeps v. Bayern*, 2014 WL 2915894 (S.D.N.Y. June 27, 2014). The court ruled that the plaintiffs' claims were not "based upon" Bavaria's acquisition of the Painting in 1964-65. Rather, the "gravamen" of their claims concerned the initial wrongdoing of Nazi Germany some 30 years earlier in forcing Mendelssohn-Bartholdy to sacrifice the Painting.[87]

The court concluded that Bavaria's acquisition of the Painting in New York in 1964-65 and its refusal to return it in 2010 upon demand furnished no basis for asserting jurisdiction.[88]

The court found that Soehner did not ask Thannhauser to sell the Painting to Bavaria when Soehner met with him in New York in the spring of 1964, nor did Thannhauser then agree to sell the Painting. Rather, the court found that the parties *at the very most* merely agreed to talk in the future.[89] The court acknowledged, however, that Soehner "most likely" saw the Painting while in New York.[90]

---

[87] A-682.
[88] A-686.
[89] A-683-684.
[90] A-677-679.

The court found that Thannhauser shipped the Painting to EBA in Vaduz merely "to avoid" – rather than to evade – taxes.[91] The court concluded that Bavaria paid for the Painting not by sending Thannhauser a deposit- only check to New York, but rather that it paid EBA in Vaduz for the Painting directly.[92]

The court denied that Bavaria had impaired a New York governmental interest – or induced any other "direct effect" in the U.S. – by causing a stolen painting to be shipped from New York into international commerce, and said that this argument was "balderdash."[93]

Finally, the court declared that it had viewed all evidence in the light most favorable to plaintiffs.[94]

**SUMMARY OF ARGUMENT**

A. The District Court misconstrued the paramount "based upon" criterion of § 1605(a)(2), and thereby undermined the FSIA. The "threshold step" in applying § 1605(a)(2) is to "***identify the act of the foreign State*** defendant that serves as the basis for plaintiff's claim."[95] The court ignored this prescription. Rather than acknowledging that the plaintiffs' claims were "based upon" the commercial activities of Bavaria in recklessly acquiring

---

[91] A-681.
[92] A-681.
[93] A-686.
[94] A-677.
[95] *Garb v. Poland*, 440 F. 3d 579, 586 (2d Cir. 2006) (Emphasis and italics supplied).

24

the Painting in New York in 1964-65 – and then wrongfully refusing to return it in 2010 – the court ruled that their claims instead were "based upon" the Nazi duress that had compelled Mendelssohn-Bartholdy to relinquish the Painting in 1934-35. But the term "based upon" is not a colloquialism as the court's ruling intimates, but rather is a pivotal statutory term under § 1605(a)(2) with a precisely defined judicial meaning. *Saudi Arabia v. Nelson*[96] instructs that a particular claim is ***"based upon"*** the commercial conduct of a foreign sovereign ***when that conduct supplies a discrete element of such claim.***

The court misapprehended *Garb* and *Nelson*. By making the conduct of Nazi Germany – rather than Bavaria – the putative "basis" of the plaintiffs' claims, the court skewed its analysis at inception. It made irrelevant Bavaria's extensive commercial activities in and affecting New York in acquiring the Painting, and its concomitant injury to an important New York governmental interest. The court thereby subverted the goals of the FSIA. These include holding foreign sovereigns judicially accountable for their U.S. commercial activities to the same degree as private parties, and enabling a forum to assert jurisdiction when foreign states undermine important policies. New York has a vital governmental interest that Bavaria

---

[96] 507 U.S. 349, 357 (1993).

affronted when it recklessly acquired a stolen artwork in the international
New York City art market. The plaintiffs' claims relate integrally both to
Bavaria's commercial activities as well as to this interest. The court's
distorted ruling makes a mockery of New York's interest by granting
foreign sovereigns license to acquire "no questions asked" artworks stolen
anywhere outside the U.S. If not corrected, the court's ruling will spawn
disjunctive results in future FSIA jurisdictional litigation.

The court also improperly denied plaintiff, U.S. citizen, and New
York resident Enhoerning a judicial remedy against Bavaria for its purely
commercial conduct in misappropriating from the New York art market a
stolen painting that belonged to her. This result defeated the express intent of
Congress to afford judicial access especially to American citizens injured by
the commercial activities of foreign sovereigns.

B. Because the court's ruling is premised upon a misinterpretation of the
applicable legal standard – the "based upon" criterion of § 1605(a)(2) – its
findings are "clearly erroneous" and this Court can accord them no
deference. Moreover, the court's findings also are "clearly erroneous"
because they are against the overwhelming weight of evidence in most
instances, and without supporting evidence in others. The record establishes

the factual predicates for grounding jurisdiction under § 1605(a)(2) in several ways, and the Court should so determine as a matter of law.

C. The legally significant commercial activities of Bavaria outside the U.S. – which the plaintiffs' claim are "based upon" within the meaning of *Nelson* – create multiple "direct effects" that establish jurisdiction under the third prong of § 1605(a)(2). The Confirmation caused Thannhauser to ship a stolen painting into international commerce from New York to Bavaria for pre-purchase inspection. The Painting never would have left the U.S. – where it had been exclusively for the preceding 25 years – for Bavaria other than to perform the parties' contract. Bavaria's commercial activities outside the U.S. induced several additional consequential "direct effects" in the U.S. including: (1) fulfilling under New York law the discrete elements of the plaintiffs' several claims to recover the Painting; (2) purchasing property in the U.S. from a U.S. person; (3) contractually agreeing to pay Thannhauser for the Painting in New York and so doing; (4) assisting Thannhauser to evade U.S. taxes by enabling him to sell the Painting through a sham Liechtenstein entity; and (5) corresponding with Thannhauser by mail in New York and eliciting responses by U.S. mail that further Bavaria's purchase and conversion of the Painting, as well as Thannhauser's tax evasion.

27

D. Plaintiffs' claims are "based upon" the commercial activity of Bavaria in New York within the meaning of *Saudi Arabia v. Nelson*,[97] and establish jurisdiction under the first prong of § 1605(a)(2). Bavaria's commercial activity had "substantial contact" with the U.S. in two ways. First, Bavaria purchased the Painting from a U.S. "concern" – New York art dealer Thannhauser. Second, Bavaria impaired an important New York governmental interest that strives to protect the commercial integrity of the New York art market when it failed to inquire further when it learned that Nazi victim Mendelssohn-Bartholdy had owned the Painting. The plaintiffs' several claims to recover the Painting are "based upon" Bavaria's commercial activities because these activities substantiate key elements of these claims. Bavaria's activities in New York confirm an intent to exercise dominion and control over the Painting in a manner inconsistent with the plaintiffs' superior possessory rights, which is the essential element of conversion under New York law. Bavaria's commercial activities in New York also reflect an "unjust enrichment" at the expense of the plaintiffs which is integral to their equitable claims.

E. The court erred in dismissing the SAC without considering whether the plaintiffs' other claims including for unjust enrichment, constructive trust,

---

[97] 507 U.S. 349, 357 (1993).

and declaratory relief satisfied § 1605(a)(2). The law requires courts to

evaluate each discrete FSIA claim independently to ascertain whether it

fulfills jurisdictional predicates.

## ARGUMENT

I.    **The District Court Mistakenly Ruled That Plaintiffs' Claims Were "Based Upon" the Nazi Dispossession of the Painting in the 1930's**

### A. The FSIA Seeks to Make Foreign Sovereigns Judicially Accountable for Their Purely Commercial Activities

The FSIA codifies the "restrictive view" of sovereign immunity which

strives to make foreign sovereigns liable for their purely commercial acts to the

same degree as private parties.[98] Because a foreign state engaging in commercial

activities does not exercise powers peculiar to sovereigns, "sovereign immunity"

does not bar a suit based upon a foreign state's participation in the marketplace.[99]

Accordingly, when a sovereign behaves as any ordinary commercial actor, it

"should be subject to all the rules of the marketplace."[100]

So § 1605(a)(2) prescribes three exceptions to sovereign immunity that are "based upon" the commercial activities of a foreign sovereign ("the commercial activities exceptions").  This statute provides in pertinent part that a foreign sovereign will not enjoy immunity in any lawsuit:

---

[98] *Republic of Argentina v. Weltover*, 504 U.S. 607, 612-613 (1992).
[99] *Id.* at 614.
[100] *Weltover v. Republic of Argentina*, 941 F.2d 145, 151 (2d Cir. 1991).

in which the action is based upon a commercial activity carried on in the United States by a foreign state…or upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States.

Courts construe these terms liberally to achieve the statute's purpose.[101]

Bavaria's acquisition of the Painting in New York was beyond doubt a commercial activity that any private party could perform rather than an exercise of sovereign authority.[102] Accordingly, a key question in this appeal is whether Bavaria's indisputably commercial conduct in acquiring the Painting has sufficient contact with New York and to important New York governmental interests, and whether the plaintiffs' claims are adequately related to this conduct. The obvious answer is in the affirmative.

**B. The Purpose of the FSIA Is to Afford Judicial Remedies to Persons Injured by the Purely Commercial Conduct of a Foreign Sovereign That Implicates a Significant U.S. Interest**

Congress intended that U.S. citizens like plaintiff Enhoerning and others "will have access to courts to resolve ordinary legal disputes" against foreign

---

[101] *Texas Trading & Milling Corp v. Federal Republic of Nigeria,* 647 F.2d 300, 312-13 (2d Cir. 1981), overruled on other grounds by *Frontera Resources Azerbaijan Corp. v. State Oil Co. of Azerbaijan Republic,* 582 F.3d 393 (2d Cir. 2009)
[102] *Saudi Arabia v. Nelson*, 507 U.S. 349, 360 (1993).

30

sovereigns – such as this case.[103]  The purpose of the FSIA is to open U.S. courts to

persons injured by a foreign sovereign's commercial conduct that impacts a

substantial U.S. or state governmental interest. Correspondingly, courts necessarily

consider whether the foreign sovereign impaired a forum's governmental interest --

as well as the character of that interest – in deciding whether jurisdiction

attaches.[104]

### C. New York Has a Pronounced Governmental Interest in Preventing Its Art Market From Becoming an International Venue for Stolen Art Transactions

In *Solomon R. Guggenheim Foundation v. Lubell*,[105] and *Bakalar v.*

*Vavra*,[106] both courts underscored New York's  acute governmental interest  in

protecting the commercial  integrity of its art market so that it does not  become an

international sanctuary for stolen art transactions.  Both courts also punctuated the

important New York policy that encourages prospective buyers to take reasonable

precautions against acquiring stolen artworks.

---

[103] U.S.  H.R. REP. 94-1487, 94th Cong.2d Sess. 1976, 1976 U.S.C.C.A.N.6604, 6605.

[104] *Weltover, Inc. v. Republic of Argentina*, 941 F.2d 145, 152 (2d Cir. 1991) (for FSIA subject matter jurisdiction, "we concern ourselves with the extent of the contact with the United States to determine whether that nexus sufficiently implicates the interests of the forum jurisdiction in controlling conduct within its borders"); *Shapiro v. Bolivia*, 930 F.2d 1013, 1019-1020 (2d Cir. 1991)(the strong U.S. governmental interest in regulating "capital raising activities" within U.S. is relevant to finding FSIA jurisdiction based upon "commercial activity having substantial contact with the United States").

[105] 569 N.E.2d 426 (N.Y. 1991).

[106] 619 F.3d 136 (2d Cir. 2010).

In *Lubell,* the court held that an implied discovery rule does not govern New York's unique "demand and refusal" principle in actions for conversion and replevin. This principle prescribes that a cause of action for these claims does not accrue for statute of limitations purposes until the plaintiff makes a demand upon the possessor for the return of the disputed chattel.[107]  The court pointed out that in 1986 the U.S. Department of State, U.S. Department of Justice, and U.S. Information Agency had advised against proposed legislation that would have enacted such a discovery rule, fearing that New York would become a haven for international stolen art transactions.[108]

*Lubell* instructed that "New York… has long protected the right of the owner whose property has been stolen to recover the property, even if it is in the possession of a good-faith purchaser for value."[109]  *Lubell* said further that its ruling encouraged prospective buyers to be vigilant against acquiring stolen art in the refractory New York market where "illicit dealing in stolen merchandise is an industry all its own"[110]: "the better rule gives the owner relatively greater protection and places the burden of investigating the provenance of a work of art on the potential purchaser."[111]

---

[107] 569 N.E.2d at 430-31.
[108] *Id.* at 430.
[109] *Id.* at 429.
[110] *Id.* at 427.
[111] *Id.* at 431.

*Bakalar* reaffirmed "an overarching concern that New York not become a marketplace for … stolen artwork."[112]  *Bakalar* elaborated that New York's concern is not merely with protecting the rights of resident New York owners in stolen property, but rather in preserving the commercial integrity of the international New York art market. *Bakalar* explained that "[i]n applying the New York rule that a purchaser cannot acquire good title from a thief, New York courts do not concern themselves with *where* the theft took place, but "simply **whether** one took place. Similarly, the residence of the true owner is not significant [,] for the New York policy is not to protect resident owners, but to protect owners generally *as a means to preserve the integrity of transactions and prevent the state from becoming a marketplace for stolen goods.*"(Emphasis supplied and italics original.)[113]  New York's policy to encourage prospective buyers to avoid stolen artworks dates to before when Soehner neglected to investigate the Painting.[114]

### D. Plaintiffs' Claims Are Integral Both to Bavaria's Acquisition of the Painting in New York and to New York's "Overarching" Governmental Interest

The key element of plaintiffs' conversion claim under New York law is an intent "to exercise dominion and control over property in a manner inconsistent

---

[112] 619 F.3d at 141.

[113] 619 F.3d at 144.

[114] *Menzel v. List*,  246 N.E.2d 742, 745 (N.Y. 1969), rebuking an art dealer for selling a Nazi-era painting to a client in 1955.

with the rights of another."[115] As established *infra*, Bavaria's many commercial

activities in New York more than show that it expressed an  intent there to treat the

Painting in a manner that defied the plaintiffs' superior possessory rights and so

satisfied this element.

Plaintiffs' additional claims similarly are grounded upon the commercial

conduct of Bavaria in New York in acquiring the Painting.  Plaintiffs' equitable

remedies seek to forestall "unjust enrichment", and to prevent wrongdoers from

obtaining and retaining property to which in equity and good conscience they are

not entitled.[116]  Bavaria acquired the right to buy the Painting in New York aware

that Mendelssohn-Bartholdy was a former owner and Nazi victim, but declined to

investigate the circumstances under which he surrendered it.[117] Bavaria thereby

obtained stolen property (the Painting) in violation of equity and good conscience.

So the plaintiffs' equitable remedies are integrally connected both with Bavaria's

commercial conduct as well as with New York's "overarching" governmental

interest to safeguard its art market by protecting their superior possessory rights.

Plaintiffs' claim for declaratory relief similarly is "based upon" the

commercial activities of Bavaria in acquiring the Painting. A declaratory judgment

---

[115] *Newbro v. Freed,* 2007 WL 642941 at 1 (2d Cir. 2007).
[116] *See generally*, *Mandarin  Trading Ltd. v. Wildenstein*, 944 N.E.2d 1104, 1110
(N.Y.2011) (enumerating the elements of unjust enrichment); *Simonds v. Simonds,*
380 N.E. 2d 189, 193 (N.Y. 1978).
[117] A-420-421; A-1085.

remedy in a FSIA action necessarily is "based upon" the commercial activity of the defendant that gives rise to plaintiffs' underlying claims.[118]

### E. The Court Mistakenly Ruled that the Plaintiffs' Claims Were "Based Upon" the Original Nazi Dispossession of the Painting from Mendelssohn-Bartholdy in 1934-35

#### 1. A plaintiff's claims against a foreign sovereign must both be "based upon" the commercial activity of the foreign sovereign in the U.S. as well as bear a "significant nexus" to this commercial activity

*Kensington International Limited v. Itoua*,[119] said that to establish jurisdiction over a foreign sovereign under the first prong of § 1605(a)(2) plaintiff must satisfy two conditions. First, its claims must be "based upon" the commercial activities of the foreign sovereign within the meaning of *Nelson*.[120] *Nelson* said that a particular claim is so sufficiently based if the sovereign's commercial activity supplies a discrete element of such claim: "the phrase is read most naturally to mean those elements of a claim that, if proven, would entitle a plaintiff to relief under his theory of the case."[121]

---

[118] *See, e.g.*, *Intel Corp. and Dell Inc. v. Commonwealth Scientific*, 455 F.3d 1364, 1371 (Fed. Cir. 2006; *De Csepel v Republic of Hungary*, 714 F.3d 591, 596 ( D.C. Cir. 2013).

[119] 505 F.3d 147, 156 (2d Cir. 2007).

[120] 507 U.S. 349, 357 (1993).

[121] *Id*.

Second, *Kensington* said that a plaintiff must show a "*significant nexus*" between the foreign sovereign's commercial activity in the U.S. and the central thrust or "gravamen" of its allegations against the defendant.[122]

### 2. The court erred in ruling that the plaintiffs' claims were somehow "based upon" the initial Nazi dispossession of the Painting in 1934-35

The court mistakenly construed the term "based upon" in a *colloquial* – rather than a legal – manner. This misinterpretation distorted its jurisdictional analysis at inception, making all but irrelevant both Bavaria's extensive commercial conduct in and affecting New York in buying the Painting and its concomitant injury to a consequential New York governmental interest. As noted, the term "based upon" means the discrete elements of a particular claim that an FSIA plaintiff asserts against a ***foreign sovereign defendant***. Accordingly – and as *Garb v. Republic of Poland*[123] illuminates – any analysis of the "based upon" criterion must begin with the "acts of the foreign sovereign" that serve as the predicate for a plaintiff's claims: "[a]s a threshold step in assessing plaintiffs' reliance on the 'commercial activity' exception, we must identify the ***act of the foreign sovereign State*** that serves as the basis for plaintiffs' claims." (Emphasis and italics added). The court misapplied this principle. An FSIA claim can only be

---

[122] 505 F.3d at 155.
[123] 440 F.3d 579, 586 (2d Cir. 2006).

"based upon" the commercial activities of a defendant foreign sovereign, and not upon the remote temporal conduct of a third party – such as the wrongful coercion of Nazi Germany in the 1930's.

As demonstrated, *infra*, plaintiffs' claims are "based upon" (within the meaning of *Nelson*) Bavaria's commercial activities in and affecting New York: Bavaria's reckless acquisition in 1964-65 of the Painting in the New York art market- -- which is expressly designed to protect the superior ownership rights of all international art theft victims -- and its wrongful refusal to return the Painting in 2010 after it learned that the Painting was a casualty of Nazi policies. The historical Nazi wrongdoing that initially caused the Painting to become stolen some 30 years before Bavaria had any commercial dealings with it is merely incidental to the plaintiffs' claims against Bavaria. Indeed, the Painting could have been stolen in some other manner, place, or time without altering the "gravamen" of the plaintiffs' allegations *against Bavaria.*

The court similarly erred in ruling that the "gravamen" – or central thrust -- of the plaintiffs' claims was that "title to *Madame Soler* never rightfully passed to Thannhauser in Germany because 'Mendelssohn–Bartholdy consigned the Painting (to Thannhauser) in 1934 only after nearly two years of intensifying Nazi persecution.'"[124] But the gravamen – or central thrust – of the plaintiffs' claims

---

[124] A-682.

*against Bavaria* as a foreign sovereign defendant is decidedly *not* that *some thirty years before Bavaria had any commercial dealings with the Painting* the Nazi government forced Mendelssohn-Bartholdy to relinquish it, or that Thannhauser later embezzled the Painting from his widow.

### 3. The conduct of *third parties* cannot be legally relevant to deciding FSIA jurisdiction

Interpreting "based upon" and "gravamen" to consider the conduct of *third parties* opens a Pandora's box of conceptually spurious inquiries that are relevant to *none* of the established touchstones for FSIA jurisdiction: (1) the discrete commercial activities of a foreign sovereign in or affecting the U.S.; (2) whether these activities materially impact a U.S. governmental interest and; (3) whether the claims of the plaintiff relate sufficiently to these activities.

The court's ruling negates New York's declared governmental interest in not becoming a venue for the sale of artworks stolen internationally. The district court reasoned that "if this action were ever to reach the merits, the focus of the case would be almost exclusively on the circumstances of Mendelssohn-Bartholdy's original sale to Thannhauser in Europe in the 1930's."[125] But as the court in *Bakalar* stressed, New York has an "overarching concern that New York not become a marketplace … for stolen artwork."[126] Accordingly, "New York courts

---

[125] A-682.
[126] 619 F.3d at 141.

do not concern themselves with the question of *where the theft took place*, but simply *whether* one took place." [127] (Emphasis and italics supplied) But making *where* an artwork sold in New York was originally stolen relevant (if not dispositive) for ascertaining jurisdiction vitiates New York's declared policy in this regard. Under the court's reasoning, foreign sovereigns would be immune from jurisdiction under the FSIA – and from judicial accountability -- whenever they bought in New York an artwork that was stolen *any place other* than in the U.S. Indeed, Bavaria conceded at the December 23, 2013 hearing that its jurisdictional argument entailed this result.[128] So the court's ruling grants foreign sovereigns special license to buy stolen artworks "no questions asked" in New York with impunity – a privilege that professional criminals would envy. So rather than interpreting the FSIA to make a foreign sovereign liable for its commercial activities to the same degree as a private person, the court's ruling instead establishes an incoherent double standard.

Moreover, the court's skewed reasoning portends troubling consequences far beyond the New York art market. The court's misguided ruling – if not corrected – will enable foreign sovereigns to exploit other international New York markets without being held judicially accountable. If left unchecked, the court's ruling will sabotage principled FSIA jurisdictional analysis, undermine pronounced

---

[127] *Id.* at 144 (emphasis and italics added).
[128] A-278-280.

governmental interests of forum states, and spawn preposterous results limited only by the legal imagination.

### 4. Plaintiffs satisfy any reasonable judicial interpretation of the "significant nexus/gravamen" test

As demonstrated, plaintiffs' claims relate integrally both to the commercial conduct of Bavaria in acquiring the Painting as well as to New York's governmental interest in championing the ownership rights of international art theft victims as a way to  protect the commercial integrity of  its art market.  Bavaria's proactive invocation of the New York art market distinguishes this case from recent decisions in which the Court has ruled that plaintiffs had failed to demonstrate a sufficiently close nexus between the commercial activities of the foreign sovereign and the essence or "gravamen" of their complaints.  These include *Guirlando v. T.C. Ziraat Bankasi A.S.,*[129] *Kensington International Limited v. Itoua*,[130] and the more remote *Antares Aircraft, L.P. v. Federal Republic of Nigeria*.[131] In none of these cases did a foreign sovereign proactively seek a commercial opportunity in a U.S. market as Bavaria did in acquiring the Painting. Nor did the commercial activities of a foreign sovereign impair an express governmental interest of the U.S. that was specifically designed to protect the

---

[129] 602 F.3d 69 (2d Cir. 2010).
[130] 505 F.3d 147 (2d Cir. 2007).
[131] 999 F.2d 33 (2d Cir. 1993).

plaintiff, in how Bavaria both neglected to investigate the Painting and then expunged Mendelssohn- Bartholdy's name from its provenance.

Moreover, holding Bavaria judicially accountable validates New York's paramount governmental interest in applying its law to the conduct of foreign parties whenever they invoke a New York market or the privilege of conducting business in New York.[132]

## II.  The Court's Findings of Fact Are "Clearly Erroneous"

### A. The court's findings are premised upon a misapplication of law

The Court should ignore the district court's findings because they are predicated upon legal error. A finding is "clearly erroneous" – and entitled to no deference – when it is based upon a mistaken legal standard.[133]   Moreover, the Supreme Court has instructed that factual findings grounded upon an error of law cannot be salvaged:

---

[132] *Weltover,* 941 F.2d at 151.  *See also Ehrlich-Bober & Co. Inc. v. University of Houston*, 404 N.E.2d 726, 731 (N.Y. 1980)("[A] State entering this jurisdiction specifically to take advantage of its unique commercial resources may be considered to have given up any claim of jurisdictional immunity by virtue of governmental capacity"); *Israel Discount Bank Limited v. Rosen*, 452 N.E.2d 1213, 1215 n. 1 (N.Y. 1983)("[t]his State has a strong interest in regulating commercial transactions which take place largely within its boundaries").

[133] 9 Wm. J. Moore, et al., *Moore's Federal Practice*, §52.31[4] at 52-64 (3d ed. 2013).

[f]indings of fact may often be...influenced by what the finder is looking for. Historical facts 'found' in the perspective framed by an erroneous legal standard cannot plausibly be expected to furnish the basis for correct conclusions if and merely because a correct standard is later applied to them.[134]

Because the court's findings are premised upon its misperception that the plaintiffs' claims are "based upon" Nazi wrongdoing in the 1930's – rather than upon Bavaria's commercial activities in New York decades later – the Court should accord them no deference.

### B. The court's findings are against the overwhelming weight of evidence and without supporting evidence

Even assuming, *arguendo*, that the court did not err in applying the FSIA, its findings nonetheless are "clearly erroneous" because they are against the great weight of evidence often, and without factual support otherwise. A finding may be found to be "clearly erroneous' when, *inter alia*: (1) it is not supported by substantial evidence; (2) substantial evidence supports the finding but the reviewing court concludes that the finding is, nevertheless, against the clear weight of the evidence; (3) the district court disregarded substantial evidence that would militate against the conclusion reached; or (4) the finding is directly contrary to the only testimony presented.[135] Plaintiffs will elaborate the deficiencies of the court's

---

[134] *Rogers v. Richmond*, 365 U.S. 534, 547 (1961).

[135] 9 Wm. J. Moore, *et al., Moore's Federal Practice,* §52.31[4] (3rd. ed. 2013); *United States v. United States Gypsum Co.*, 333 U.S. 364, 395 (1948).

discrete findings, *infra,* when it shows that jurisdiction attaches under both relevant prongs of §1605(a)(2).

### C. Bavaria has failed to sustain its evidentiary burden for asserting sovereign immunity

When – as here – "the plaintiff satisfies her burden that an FSIA exception applies, the foreign sovereign then bears the ultimate burden of persuasion that the FSIA exception does not apply."[136] Based upon its own documents and related necessary inferences, Bavaria has not – and cannot – satisfy this burden.

### III. Bavaria's Commercial Activities – Upon Which the Plaintiffs' Claims Are Based – Created Multiple "Direct Effects" in the U.S. That Establish Jurisdiction Under §1605(a)(2)

### A. The Several Legal Requirements for "Direct Effect" Jurisdiction

Section 1605(a)(2) prescribes in pertinent part that jurisdiction attaches over a foreign sovereign when "based upon" an act that it commits outside the U.S. in connection with commercial activity that it conducts elsewhere, and such act "causes a direct effect in the United States."  The requirements are:

> i.   "**direct effect**":  The commercial activity of the foreign sovereign outside the U.S. must cause a "direct effect" in the U.S.  *Republic of Argentina v. Weltover*[137] said that such effect need be neither

---

[136]  *Swarna v. Al-Awadi*, 622 F.3d 123, 143 (2d Cir. 2010).
[137] 504 U.S. 607, 618 (1992).

substantial nor foreseeable, but merely must follow "as an immediate consequence of the defendant's …activity."

ii.   "**based upon**":  A plaintiff's claim must be sufficiently "based upon" the subject commercial activity of the foreign sovereign within the meaning of *Saudi Arabia v. Nelson*[138]*, discussed *supra.*

iii.  **"significant nexus"**: A "*significant nexus*" must exist between the commercial activities of the foreign sovereign and the "plaintiff's cause of action".[139]  And "[t]his 'degree of closeness' must exist between the commercial activity and the gravamen of the plaintiff's complaint."[140]

iv.   "**legally significant act**": In *Guirlando  v. T.C. Ziraat Bankasi A.S.,*[141] the court said that this criterion means simply that the defendant's conduct that is alleged to have had a direct effect in the United States "must be legally significant."

v.   "**minimum contacts**": Finally, some minimum contact between the foreign sovereign and the forum regarding the dispute may be necessary before a U.S. court fairly can assert jurisdiction over a foreign sovereign based upon a "direct effect" that its commercial

---

[138] 507 U.S. 349, 357 (1993).
[139] *Kensington International Limited v. Itoua*, 505  F.3d 147, 155 (2d Cir.  2007).
[140] *Id.* at 156.
[141] 602 F.3d 69, 77 (2d Cir.2010).

conduct abroad had in the U.S. *Republic of Argentina v. Weltover*[142] held that Argentina satisfied whatever necessary constitutional minimum contacts when it availed itself of the privilege of conducting business in the U.S. by issuing negotiable debt instruments in the U.S. Correspondingly, Bavaria similarly availed itself of the privilege of transacting business in the U.S. when it invoked the New York art market, as discussed *supra*. Bavaria's acquisition of the Painting in New York beyond doubt constituted "transacting business" sufficient to sustain jurisdiction under New York's long arm statute CPLR § 302(a)(1).[143]

The "direct effects" clause should be interpreted liberally to afford judicial access to those injured by the commercial conduct of foreign sovereigns.[144]

---

[142] 504 U.S. 607, 619-620 (1992).

[143] By soliciting the New York art market to acquire the Painting, Bavaria fulfilled the "'overriding criterion necessary to establish a transaction of business'… some act by which the defendant purposefully avails itself of the privilege of conducting activities within [New York]" and thereby invokes the "'benefits and protections" of New York law. *Ehrenfield v. Bin Mahfouz*, 881 N.E.2d 830, 834-35 (N.Y. 2007)(citations omitted).

[144] *Texas Trading & Mill. Corp. v. Federal Republic of Nigeria*, 647 F.2d 300, 312 (2d Cir.1981).

**B. Bavaria's Legally Significant Commercial Activities in Europe Induced Multiple "Direct Effects" in the U.S. Upon Which the Claims of the Plaintiffs Are Based**

**1. The Confirmation caused Thannhauser to ship a stolen painting from New York into international commerce**

The Confirmation caused Thannhauser to ship a stolen painting from New York to Bavaria in violation both of the NSPA[145] as well as New York's "overarching concern that New York not become a marketplace for …stolen artwork."[146] No reasonable argument can be made that Thannhauser would have shipped **both** *Madame Soler* and *Rouart* together from New York – where *Madame Soler* had been in his collection for the previous 25 years[147] – to Europe in the summer or fall of 1964 other than to fulfill the parties' bargain. Indeed, the court's findings compel this conclusion. The court found that Thannhauser's putative "desire to avoid U.S. taxes on the sale" resulted in the Confirmation being signed in Europe and the Painting being sent to Switzerland.[148]

The plaintiffs' claims are "based upon" the commercial conduct of Bavaria that induced this "direct effect". As discussed *infra* at pages 56-57, the key element of conversion under New York law is "an intent to exercise dominion and

---

[145] 18 U.S.C.§§ 2314-15 (1948).
[146] *Bakalar,* 619 F.3d at 141.
[147] A-947.
[148] A-681.

control over property in a manner inconsistent with the rights of another."[149]  The Confirmation signals such an intent unequivocally. And the essential element of the plaintiffs' claims for unjust enrichment and constructive trust is obtaining property when equity requires that it be returned to its rightful owner. *See infra* at sections D(3)(b) and (c). The Confirmation wrongfully seeks to obtain a stolen artwork while eschewing the reasonable inquiries that would have revealed that it belonged to plaintiffs.

A close nexus exists between the Confirmation and the thrust or "gravamen" of the plaintiffs' claims.  The Confirmation reflects an assertion of dominion and control by Bavaria over the Painting in a manner that defies their superior possessory rights– which is the key element of conversion under New York law, as well as a "commercial exploitation" of the Painting. [150]  The Confirmation also represents an intention by Bavaria to obtain the Painting wrongfully and inequitably to the plaintiffs' detriment, and their equitable claims are so premised.

Finally, the Confirmation reflects legally significant conduct by Bavaria. The Confirmation is a binding contingency contract for Bavaria to purchase the Painting at a prescribed price. It states an unequivocal intent to exercise dominion and control over the Painting in a manner that vitiates the superior possessory rights of the plaintiffs, satisfying the key element of conversion.  It also expresses

---

[149] *Newbro v. Freed,* 2007 WL 642941 at 1 (2d Cir. 2007).
[150] See section D(3)(a), *infra.*

an intention to obtain inequitably the property of plaintiffs and so fulfills the focal

element of unjust enrichment that comprises both their equitable claims. Finally,

the Confirmation enables Thannhauser to evade U.S. taxes.

### 2. Through the Confirmation Bavaria purchased property in the U.S. through a U.S. person

The purchase of property in the U.S. occasions a "direct effect" within the

meaning of § 1605(a)(2).[151]  Bavaria's purchase of the Painting in New York from

Thannhauser had a similar "direct effect" and – as in *Servaas* – its continuing

commercial contacts with New York both in performing and re-negotiating the

contingency contract amplified these "direct effects".

### 3. Through the Confirmation Bavaria enabled Thannhauser to evade U.S. taxes

The Confirmation manifests multiple indicia of Thannhauser's intent to

evade U.S taxes on the sale of the Painting in violation of 26 U.S.C. § 7201 (1954),

and concomitant complicity by Bavaria. A willful intent to evade taxes can be

established by "any conduct, the likely effect of which would be to mislead or

conceal."[152] A primary criterion is "using third parties to conceal the real owner" –

---

[151] *Servaas, Inc. v. Republic of Iraq*, 2011 WL 454501 *2 (2d Cir. 2011)(an Iraqi Ministry bought goods and services from an American corporation and made payments and shipments in the U.S., and court ruled that "[a]ny of these activities alone might have been sufficient to satisfy the statute; taken together they clearly do so").
[152] *Spies v. United States*, 317 U.S. 492, 499 (1934).

such as EBA.[153]  Moreover, fraudulent intent is apparent in a "false allocation of income."[154] In applying the federal tax laws, U.S. courts long have elevated the economic substance of a transaction over its mere form.[155]  Judicial doctrines prevent taxpayers from evading a tax by casting a transaction in a form that does not comport with its economic substance or reflect a genuine business purpose[156] -- such as Thannhauser acting as a "commission agent" on the sale of his own Painting. [157]

The Confirmation was a sham designed to evade taxes and the court so surmised.[158]  EBA had no independent business purpose or economic substance: it merely concealed that Thannhauser owned the Painting.  Moreover, Thannhauser had a compelling motive to evade taxes because he had embezzled the Painting and his basis in it for tax purposes was "zero."

---

[153] *United States v. Majors*, 196 F.3d 1206, 1213, n. 18 (7th Cir. 1999).
[154] M. Saltzman, *IRS Practice and Procedure* § 7A.02 (2013).
[155] *Gregory v. Helvering*  293 U.S. 465, 469-470 (1935); *Lubin v. Commissioner of Internal Revenue*, 335 F. 2d 209, 213 (2d Cir. 1964).
[156] *See generally*, Arthur Acevedo, *Abusive Tax Practices: The 100-Year Onslaught on the Tax Code,* 17 Barry L. Rev. 179 (2012).
[157] A-323; A-375.
[158] A-327-328;  A-550-551; A-555.

### 4. Bavaria's extensive correspondence with Soehner in New York as the sale progresses causes Thannhauser to respond by U.S. mail

Eliciting the U.S. mails to further a tort or crime causes a "direct effect" in the U.S.[159] The extensive correspondence between Thannhauser and Soehner regarding Bavaria's prospective purchase of, and payment for, the Painting occasioned multiple "direct effects" in the U.S. Letters from Soehner to Thannhauser in New York include Pl. Exhs. 55, 60, 64, 68, 74, 82, 87, 90, 92. As in *Adler*, these letters elicited responses from Thannhauser using the U.S. mails to further Bavaria's conversion of the Painting and its unjust enrichment, and to facilitate Thannhauser's tax evasion. Pl. Exhs. 56, 57, 71, 75, 83, 89.

### 5. Bavaria's bargained-for payment to Thannhauser in New York created a "direct effect" in the U.S. that the Court consistently has acknowledged

A contractually prescribed payment to the U.S. as a matter of law creates a "direct effect" in the U.S.[160] Bavaria expressly refused to pay EBA in Vaduz for the Painting. Rather, it insisted upon paying Thannhauser with a deposit-only

---

[159] *Adler v. Federal Republic of Nigeria*, 219 F.3d 869, 876 (9th Cir. 2000) (inducing U.S. mails to pay bribes in violation of a federal statute had sufficient "direct effect" in the U.S.).

[160] *Republic of Argentina v. Weltover*, 504 U.S. 607, 619 (1992)(direct effect when New York designated as the place of Argentina's contractual performance and Argentina defaulted on bonds when due); *Hannil Bank*, 148 F.3d 127, 132 (2d Cir. 1998); *Antares Aircraft v. Federal Republic of Nigeria*, 999 F.2d 33, 35-36 (2d Cir. 1993); *Int'l Hous. Ltd. v. Rafidain Bank Iraq*, 893 F.2d 8, 11 (2d Cir. 1989).

check made out to him in his personal capacity (and not as "agent") at his gallery in New York. Bavaria reaffirmed that once Thannhauser received this check, he could direct the Bank to wire the funds anywhere – to EBA if he so chose.[161] Moreover, Thannhauser expressly accepted this arrangement.[162] The definitive payment order of Finance Minister Poehner of April 28, 1965 unequivocally directs the subordinate official to send the check to Thannhauser in New York and to arrange with the Bank both to issue and transfer the check.[163] In other words, the Bank – and not Bavaria – sent the check.

Moreover, it would have been ***commercially impossible*** for Bavaria to have "paid" EBA in Vaduz with a deposit-only check made out to Thannhauser. The court did not say that Bavaria "sent" the check to Thannhauser at EBA – but rather intimated that Bavaria had ***paid*** EBA.[164] But how could Bavaria have ***paid*** EBA by sending it a deposit-only check made out to a third party – Thannhauser? Bavaria's purpose here, of course, was to ensure that Thannhauser alone directed any payment to the sham EBA.

Having insisted upon paying Thannhauser in New York rather than EBA in Vaduz – and having so benefitted by mitigating its complicity in a sham

---

[161] A-1006; A-1027; A-1034-1035.
[162] A-1024.
[163] A-1030.
[164] A-681.

transaction – Bavaria now must be estopped from denying that it paid Thannhauser in New York as the definitive payment order confirms.

Even assuming, *arguendo*, that the Bank did not send the "deposit only" check to Thannhauser in New York as the definitive payment order establishes, Bavaria nonetheless constructively paid Thannhauser in New York and Thannhauser necessarily constructively received payment in New York. Courts have applied the doctrine of "constructive payment" in a variety of contexts when a payor has set aside and earmarked funds for a payee although the payee has not actually received payment.[165]

### 6. Bavaria's refusal to return the Painting in 2010 fulfilled under New York law the discrete elements of the Plaintiffs' several causes of action

In *United States Fidelity and Guaranty Company v. Braspetro Oil Services*,[166] the court ruled that by declaring its co-obligors in default under a construction contract, a Brazilian contractor (Petrobas) had created the "direct effect" in the U.S. of giving rise to the claims of two U.S. sureties under a related indemnity agreement.[167] Bavaria correspondingly gave rise to the plaintiffs' claims

---

[165] *See, e.g.*, *Fliegler v. Commissioner of Social Security*, 117 Fed. Appx. 213, 215-216 (3d Cir. 2004); *McCall v. Astrue*, 2008 WL 5378121 at 12 (S.D.N.Y. 2008).

[166] 199 F.3d 94, 98-99 (2d Cir. 1999).

[167] The legislative history of the FSIA also relates that Congress contemplated a "direct effect" in the US whenever – under section 18 of the Restatement (Second) Foreign Relations Law of the United States (1965) – conduct abroad causes a tort

for conversion, unjust enrichment, constructive trust, and declaratory relief by refusing in 2010 to return the Painting.

Plaintiffs' claims are necessarily "based upon" the refusal of Bavaria to return the Painting as such refusal is an integral element of each such claim. The discrete elements of a claim for conversion when property is in the possession of a defendant who did not acquire it in affirmative bad faith include a demand that the property be returned, and a refusal.[168]  Accordingly, by refusing to return the Painting, Bavaria satisfied essential elements of this claim.

Bavaria's wrongful retention of the Painting from the plaintiffs also constitutes the key element of their claims for unjust enrichment and constructive trust.

A "significant nexus" also exists between Bavaria's refusal to return the Painting and these claims. Indeed the very elements of these claims are "based upon" Bavaria's refusal.

Finally, the refusal of Bavaria to return the Painting is "legally significant" for these same reasons.

---

or crime to be committed in the U.S.  H.R. REP. 94-1487, 94th Cong.2[nd] Sess. 1976, 1976 U.S.C.C.A.N. 6604, 6617.
[168] *See,* n. 183,  *infra*.

**IV. Plaintiffs' Claims Are "Based Upon" the Commercial Activity of Bavaria in New York Sufficient To Establish Jurisdiction Under the First Prong of §1605(a)(2)**

**A. The Requirements for Asserting Jurisdiction "Based Upon" the Commercial Activity of a Foreign Sovereign in the U.S.**

Section 1605(a)(2) prescribes in pertinent part that jurisdiction will attach over a foreign sovereign "in which the action is based upon the commercial activity carried on in the United States by a foreign state." Under § 1603(3) commercial activities are deemed to be "carried on in the United States" whenever they have "substantial contact with the United States." Courts require the following:

i. the commercial activity of the foreign sovereign must have "**substantial contact**" with the U.S. [169]

ii. the claims of the plaintiff must be "**based upon**" the commercial activity of the foreign sovereign in the U.S. [170]

iii. a "**significant nexus**" must exist between the claims of the plaintiff and the commercial conduct of the foreign sovereign – the central thrust or "gravamen" of the plaintiff's claims

---

[169] §§ 1605(a)(2), 1603(3).
[170] *See* § 1605(a)(2) and *Saudi Arabia v. Nelson* 507 U.S. 349, 357 (1993).

must relate closely to the commercial activity of the foreign

sovereign in the U.S.[171]

## B. The Commercial Activities of Bavaria in Acquiring the Painting Have "Substantial Contact" with the U.S in Two Ways

### 1. Bavaria Purchased the Painting from a U.S. concern or person – Thannhauser

"[S]ales to and purchases from U.S. concerns satisfy the substantial contact

requirement."[172]  Bavaria purchased the Painting from a U.S. "concern". Bavaria

conceded that Thannhauser – and not EBA – was the owner and seller of the

Painting.[173]  Moreover, Bavaria insisted upon paying Thannhauser in New York in

his personal capacity.[174]  Accordingly, merely that Thannhauser invoked EBA as a

sham intermediary in an attempt to evade taxes does not alter that Bavaria bought

the Painting from him.

---

[171] *Kensington  International Limited v. Itoua*, 505 F.23d 147, 155 (2d Cir. 2007).
[172] *Ministry of  Supply. Cairo v Universe Tankships, Inc.*, 708   F.2d 80, 84 (2d Cir. 1982)(citing the legislative history of the FSIA listing "'import-export transactions involving sales to, or purchase from, concerns in the United States' as conduct within the contemplation of the first clause of § 1605(a)(2)."
[173] A-323; A-375.
[174] A-1021.

### 2. Bavaria's acquisition of the Painting impaired several important U.S. and New York governmental interests

A foreign sovereign has "substantial contact" with the U.S. when its commercial activity affects a significant U.S. governmental interest.[175]  Bavaria's reckless acquisition of the Painting impaired New York's "overarching concern that New York not become a marketplace for stolen …artwork".[176]  It also furthered Thannhauser's tax evasion scheme in violation of 26 U.S.C.§ 7201 (1954).

### C. The Plaintiffs' Claims Are "Based Upon" the Commercial Activity of Bavaria in the U.S.

### 1. Plaintiffs' Conversion Claim Is "Based Upon" the Commercial Activities of Bavaria in New York in Acquiring the Painting

*Nelson* held that a particular claim is "based upon" the commercial conduct of a foreign sovereign if that conduct supplies an element of such claim.[177]  The primary element of conversion under New York law is an  intent to exercise dominion and control over property in a manner antagonistic to the superior

---

[175] *Shapiro v. Republic of Bolivia,* 930 F.2d 1013, 1019 (2d Cir. 1991)( by introducing bearer notes into the U.S. Bolivia had "substantial contact" with the U.S. because the U.S. has a "strong interest in capital raising activities within its borders").
[176] *Bakalar*, 619 F.3d at 141.
[177] 507 U.S. 349, 357 (1993).

possessory rights of another.[178]  Accordingly, conversion does not require that the defendant physically possess another's property.[179]

   ***Mere words alone*** can satisfy the intent requirement if uttered in close proximity to the property and in a manner that shows a purpose to negate the superior possessory rights of another.[180] Any "commercial exploitation" of the property of another satisfies this requirement.[181]  When property is in the continuing possession of one who acquired it not in "bad faith," New York law imposes as ***additional discrete elements*** a demand and refusal "to give persons in mistaken possession of stolen property an opportunity to rectify their good-faith mistakes before they incur legal liability."[182]  New York federal judicial decisions consistently enumerate the additional demand and refusal requirements for conversion in this context as elements ***separate and discrete*** from the core component of dominion and control.[183]

---

[178] *Newbro v. Freed*, 2007 WL 642941 at 1 (2d Cir. 2007)("[u]nder New York law, an action for conversion 'does not require defendant's knowledge that he is acting wrongfully, but merely an intent to exercise dominion or control over property in a manner inconsistent with the rights of another"), quoting *Lopresti v. Terwilliger,* 126 F.3d  34, 42 (2d Cir. 1997).

[179] *State v. Seventh Regiment Fund, Inc.,* 774 N.E.2d 702, 711 (N.Y. 2002).

[180] *Gillet v. Roberts,* 57 N.Y. 28, 32-33 (N.Y. 1874).

[181] *State v. Seventh Regiment Fund, Inc.,* 774 N.E.2d 702, 711 (N.Y. 2002).

[182] Marilyn E. Phelan, *Scope of Due Diligence Investigation in Obtaining Title to Valuable Artworks,* 23 Seattle U. L. Rev. 633, 641 (2000), citing *Gillet v. Roberts*, 57 N.Y 28, 34 (1874).

[183] *Lenard v. Design Studio*, 889 F. Supp.2d 518, 531 (S.D.N.Y. 2012)(to state a claim for conversion, a plaintiff must allege that "(1) the party charged has acted

Bavaria's collective commercial activities in New York through its agent Soehner confirm an intent to exercise dominion and control over the Painting in derogation of the superior possessory rights of the Mendelssohn heirs within the meaning of these authorities, and within the "overarching concern that New York not become a marketplace for …stolen artwork."[184]  The evidence confirms that:

1.  Soehner shops the U.S. for an opportunity to buy modern artworks at affordable prices and responsive to the Martin agenda;[185]  the ambitious Soehner wants to use his trip to make contacts with U.S. dealers and collectors;[186] Soehner scours the American continent for an early period Picasso;[187]

2.  Soehner "cultivates connections" in New York with Thannhauser to pursue the opportunity to buy modern artworks responsive to the Martin agenda;[188]

---

without authorization, and (2) exerted dominion or a right of ownership over property belonging to another..., (3) the rightful owner makes a demand for the property, and (4) the demand for the return is refused");  *Pacific M. International Corp. v. Raman International Gems, Ltd.*, 888 F. Supp.2d 385, 396 (S.D.N.Y. 2012); *Goodman v. Port Authority of New York and New Jersey*, 850 F. Supp.2d 363, 388 (S.D.N.Y. 2012).

[184] *Bakala*r, 619 F.3d at 141.

[185] A-986.

[186] A-824.

[187] A-986.

[188] A-958.

3.   Soehner visits Thannhauser's art gallery to offer to buy the Painting and signs Thannhauser's guest register;[189]

4.  At  Thannhauser's gallery  Soehner offers to buy the Painting;[190]

5.   Thannhauser agrees to sell the Painting and proposes a price;[191]

6.  The parties agree upon a price;[192]

7.  The parties agree upon payment terms;[193]

8.  Thannhauser tells Soehner that Mendelssohn Bartholdy – a famous Jewish banker and Nazi victim – owned the Painting;[194]

9.  Soehner – a former Nazi party member and aware that Nazi policies forced Jews to relinquish copious artworks – declines to investigate;[195]

10.  Soehner **physically inspects** the Painting incident to deciding whether to offer to buy it, subjecting the Painting to risk of damage;[196]

11. The parties agree to meet later to sign a contract to seal their bargain which by then is a mere formality. Soehner knows that he will be the

---

[189] A-828-829; A-958; A-963.
[190] A-958; A-963; A-986; A-990; A-1000.
[191] *Id.*
[192] *Id.*
[193] *Id*.
[194] A-420-421; A-1085; A-1095.
[195] A-85-88.  Bavaria has never claimed that it investigated whether the Painting was stolen before the purchase.
[196] A-448.

Director of the BSPC in six weeks and then can commit Bavaria to a contingency contract.

The foregoing confirms that in New York Bavaria expressed an unequivocal intent to exercise dominion and control over the Painting and to asport it to Bavaria for pre-purchase inspection as the Confirmation contemplates. Not only did Bavaria reach agreement with Thannhauser in New York on all material terms of their bargain, Bavaria also inspected the Painting at Thannhauser's gallery. Bavaria thereby exercised an unauthorized physical dominion and control over the Painting in New York and exploited it commercially. Bavaria's commercial activities not only satisfy the core element of conversion, but also undermine the "overarching" governmental interest of New York in protecting the commercial integrity of its art market. The activities – collectively considered – made New York an international market for the sale of a stolen painting, thereby frustrating *Lubell* and *Bakalar*. Accordingly, New York has a compelling governmental interest in asserting jurisdiction over Bavaria in this case.

Overwhelming evidence – both direct and circumstantial – corroborates that Soehner and Thannhauser struck their bargain in New York just as Soehner's memoranda reaffirm. Soehner's November 11, 1964 memorandum[197] is unambiguous that he met with Thannhauser in New York in the spring of 1964

---

[197] A-957-958.

where – upon Soehner's request – Thannhauser agreed to sell Bavaria both *Madame Soler* and *Rouart* at prices that Bavaria deemed favorable.[198]  No reasonable construction of this document would place any segment of this conversation as occurring any place or time other than at Thannhauser's gallery when the two met. Moreover:

1.  The November 11, 1964 memorandum – written several months after the August 3, 1964 Confirmation – refers only to a bargain in New York for the paintings,  and not to any later discussions elsewhere;

2.  The November 11, 1964 memorandum describes the bargain for both paintings in terms of  a conversation between Soehner and Thannhauser –what Thannhauser "said" – and not in terms of any written agreement such as the Confirmation embodied;

3.  The November 11, 1964 memorandum relates that in New York the parties arrived at terms for Bavaria to buy not only *Madame Soler* but also *Rouart.* But the parties did not enter a written contract for *Rouart* until after May 10, 1965.[199] So where could they have reached terms for *Rouart* other than in New York as Soehner so clearly stated?

---

[198] A-958.
[199] A-1405.

4. The November 12, 1964 memorandum removes any doubt about where the parties reached a deal for both paintings.[200] It says unequivocally that Soehner asked Thannhauser to sell the paintings – and that Thannhauser agreed to do so – when the parties met in New York: Thannhauser "offered both pictures to the Director General, Dr. Soehner, on the occasion of the latter's recent trip to America, when the latter asked for both pictures." It is all but inconceivable that the parties discussed an offer to buy the paintings but neglected to discuss prices;

5. The Bavarian government contemporaneously understood that Soehner had acquired the opportunity to buy the Painting when he visited Soehner in New York. This narrative appears in the December 29, 1964 letter of Minister Huber to the Bavarian State Ministry of Finance[201], as well as in two Bavarian news articles;[202]

6. During this time Soehner both was BSPC Director as well as in charge of its media relations but never corrected these consistent accounts;

---

[200] A-963.

[201] A-990.

[202] A-986; A-1000.

7.    In no document does Soehner intimate that he acquired the
opportunity to obtain the Painting at Cap Ferrat on August 3, 1964. As
discussed, Soehner's consistent narrative is that he negotiated terms
for both paintings in New York;

8.    Bavaria necessarily inspected an invaluable Painting before agreeing
to buy it. The inspection could have occurred only in New York when
Soehner saw the Painting. The record contains no evidence that the
Painting was at Cap Ferrat when Soehner signed the Confirmation on
August 3, 1964;

9.    Soehner's effusive letter of July 1, 1964 expressing "gratitude" to
Thannhauser – Soehner's first act as the new Director – makes no
sense unless Soehner had struck a bargain with Thannhauser for the
Painting on terms favorable to Bavaria. Why would Soehner express
such extraordinary "gratitude" to Thannhauser if in New York the
parties had agreed only to meet later to discuss the ***mere possibility***
that Thannhauser might sell Bavaria the Painting?

10.    As the court commented, the Confirmation bears every indicia of
having been typed at the Hôtel Intercontinental Genève (Hotel) before
the parties met at Cap Ferrat to sign it.[203]  It is highly implausible that

---

[203] A-429.

in France the parties would have committed to writing on Hotel

stationary with a **German** typewriter a deal that they had just struck.

Moreover, the record contains no evidence that Soehner ever was at

the Hotel. Far more likely, while at the Hotel Thannhauser typed the

bargain that the parties had reached in New York, and Soehner signed

it on August 3, 1964 at Cap Ferrat;

11.    By October 16, 1964, Thannhauser had shipped both paintings to

Europe, although the parties would not sign a written contract for

*Rouart* until after May 10, 1965.[204] So where did the parties reach a

deal on *Rouart* that would have induced Thannhauser in October 1964

to ship both paintings to Bavaria for pre-purchase inspections? As

Soehner recounts repeatedly, in New York the previous spring.

12.    Bavaria recently twice has conceded that Soehner acquired the

Painting from Thannhauser in New York.[205] The court found the

October 17, 2011 statement of General Director Schrenk to be a party

admission and highly probative.[206]

---

[204] A-1405.
[205] A-1085; A-1094.
[206] A-412-415.

### 2. Plaintiffs' Equitable Claims and for Declaratory Relief Are "Based Upon" the Commercial Activities of Bavaria in Acquiring the Painting in New York

Plaintiffs' equitable claims for unjust enrichment, constructive trust, and declaratory relief also are "based upon" the commercial conduct of Bavaria in acquiring the Painting in New York. A claim for unjust enrichment concerns "[t]he essential inquiry... whether it is against equity and good conscience to permit the defendant to retain what is sought to be recovered."[207] The discrete elements are: (1) that the defendant was enriched, (2) at the plaintiff's expense, and (3) that it is against equity and good conscience to permit the defendant to retain what is sought to be recovered.[208] Unjust enrichment is a legal conclusion "reached through the application of principles of equity."[209] A constructive trust is a flexible equitable remedy also designed to prevent unjust enrichment and is "imposed in favor of one entitled to property that is wrongfully withheld or where to allow the present holder to retain the property would result in unjust enrichment".[210] Unjust enrichment is the "key factor" in deciding whether to impose a constructive

---

[207] *Mandarin Trading, Ltd. v. Wildenstein*, 944 N.E.2d 1104, 1110 (N.Y. 2011).
[208] *Id.*
[209] *Sharp v. Kosmalski*, 351 N.E.2d 721, 724 (N.Y. 1976).
[210] *Stone v. Williams,* 970 F.2d 1043, 1051 (2d Cir.1992).

trust.[211] Moreover, courts apply the elements of a constructive trust flexibly to prevent unjust enrichment.[212]

Plaintiffs' claims for unjust enrichment and constructive trust are "based upon" the commercial conduct of Bavaria in wrongfully obtaining an opportunity to buy the Painting in New York without investigating whether it was stolen, expunging Mendelssohn-Bartholdy from the provenance, and later fraudulently denying their claim for restitution.[213] As noted, *supra*, plaintiffs claim for declaratory relief similarly is "based upon" Bavaria's commercial conduct in New York in acquiring the Painting.[214]

## V. The District Court Failed to Address Whether Jurisdiction Attaches Over Plaintiffs' Other Claims Including for Unjust Enrichment, Constructive Trust and Declaratory Relief

The court failed to evaluate whether plaintiffs' claims other than for conversion satisfied § 1605(a)(2). "To establish jurisdiction over an entity covered by the FSIA, each individual claim contained in the complaint must be analyzed to determine if it comes within an exception to foreign sovereign immunity."[215] In *Holy See*, the court ruled that merely because a negligence claim satisfies an FSIA

---

[211] *In re Koreag, Controle et Revision S.A. v. Refco F/X Assoc., Inc.,* 961 F.2d 341, 354 (2d Cir.1992).

[212] *Counihan v. Allstate Ins. Co.,* 194 F.3d 357, 362 (2d Cir.1999).

[213] A-120-121; A-126.

[214] *See* discussion, *supra* at 34-35.

[215] *Doe v. Holy See*, 557 F.3d 1066, 1087 (9th Cir. 2009); *see also Joseph v. Office of the Consulate Gen. of Nigeria*, 830 F.2d 1018, 1023–25 (9th Cir.1987).

exception does not determine whether a fraud claim does also. Each count must be analyzed separately.[216]

The court failed to consider any count in the SAC except conversion (Count Two). As discussed, *supra,* Count Three (Restitution Based Upon Unjust Enrichment), Count Seven (Constructive Trust), and Count Nine (Declaratory Relief) as well as plaintiffs' other counts satisfy the jurisdictional criteria of §1605(a)(2).

**CONCLUSION**

The Court should disregard the findings of the District Court and rule that as a matter of law jurisdiction attaches over plaintiffs' claims for conversion, unjust enrichment, constructive trust, equitable estoppel, fraud, and declaratory relief. The court misperceived that plaintiffs' claims were "based upon" Nazi wrongdoing, and that a "binding agreement" between the parties in New York was somehow necessary to confer FSIA jurisdiction. An FSIA case readily cannot be hypothecated that presents a closer, more integral connection between: (1) the purposeful and admitted commercial activity of a foreign sovereign in and affecting New York; (2) an important governmental interest that this conduct affronted and which expressly protects a plaintiff's rights; and (3) the claims of a plaintiff.

---

[216] *Id.*

Respectfully submitted,

/s/   John J. Byrne, Jr.
John J. Byrne, Jr.
Thomas J. Hamilton
Byrne Goldenberg & Hamilton, PLLC
1025 Connecticut Avenue, N.W,
Suite 1012
Washington, D.C. 20036
Tel:  (202) 857-9775
Fax: (202) 857 -9799
Email: johbyr2@gmail.com
Email: tj.ham.@cox.net

Attorneys for Plaintiffs-Appellants Julius H. Schoeps,
Britt-Marie Enhoerning and Florence von Kesselstatt

## CERTIFICATE OF COMPLIANCE WITH FRAP 32(A)

1.   This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 13,925 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.   This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman, 14 point font.

Respectfully submitted,

/s/   John J. Byrne, Jr.
John J. Byrne, Jr.
Thomas J. Hamilton
Byrne Goldenberg & Hamilton, PLLC
1025 Connecticut Avenue, N.W,
Suite 1012
Washington, D.C. 20036
Tel:  (202) 857-9775
Fax: (202) 857 -9799
Email: johbyr2@gmail.com
Email: tj.ham.@cox.net

Attorneys for Plaintiffs-Appellants Julius H. Schoeps, Britt-Marie Enhoerning and Florence von Kesselstatt

SPECIAL APPENDIX

# **<u>Table of Contents</u>**

**<u>Page</u>**

Opinion and Order of the Honorable Jed S. Rakoff,
     dated June 27, 2014 ..................................................... SPA1

Judgment of the United States District Court, Southern District
     of New York, filed June 30, 2014, Appealed From ..................... SPA12

Foreign Sovereign Immunities Act of 1976, 28 U.S.C.
     § 1605(a)(2)(commercial activities exception) ........................... SPA13

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------x
JULIUS H. SCHOEPS, BRITT-MARIE      :
ENHOERNING, and FLORENCE VON        :        13 Civ. 2048 (JSR)
KESSELSTATT,                        :
                                    :        OPINION AND ORDER
        Plaintiffs,                 :
                                    :
            -v-                     :
                                    :
FREISTAAT BAYERN, or FREE STATE OF  :
BAVARIA, A STATE OF THE FEDERAL     :
REPUBLIC OF GERMANY,                :
                                    :
        Defendant,                  :
                                    :
-------------------------------------x



JED S. RAKOFF, U.S.D.J.

On March 27, 2013, plaintiffs Julius H. Schoeps, Britt-Marie

Enhoerning, and Florence Von Kesselstatt, heirs of the late Jewish

banker Paul von Mendelssohn-Bartholdy, commenced this action against

the German State of Bavaria to recover a painting by the legendary

artist Pablo Picasso entitled *Madame Soler*. Previously owned by

Mendelssohn-Bartholdy, *Madame Soler* was the subject in 1934 Berlin

of an alleged forced transfer under the then-Nazi regime, and after

another change in custody, now resides in a Munich museum under the

custody of Bavaria. Second Amended Complaint ("Am. Compl.") ¶¶ 1-2.[1]

Following commencement of this action, defendant Bavaria

brought a motion pursuant to the Federal Rules of Civil Procedure

12(b)(1) to dismiss this action for lack of subject matter

---

[1] On October 17, 2011, the Bavarian State Painting Collection
"reject[ed] the demand for restitution made by the heirs to
Mendelsoohn-Bartholdy." Plaintiff's hearing exhibit ("Pl. Ex.") 98.

1

jurisdiction under the Foreign Sovereign Immunities Act, 28 U.S.C. § 1605(a)(2) ("FSIA"). The FSIA "provides the sole basis for obtaining jurisdiction over a foreign state in the courts of this country." *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 443 (1989). Section 1605(a)(2) of the FSIA provides for jurisdiction over a foreign state in three instances: (1) where a plaintiff's claim is "based upon" "a commercial activity carried on in the United States by the foreign state"; (2) where a plaintiff's claim is "based upon" "an act performed in the United States in connection with a commercial activity of the foreign state elsewhere"; or (3) where "an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere causes a direct effect in the United States." 28 U.S.C. § 1605(a)(2).

After initial briefing and oral argument on December 23, 2014, the Court determined that an evidentiary hearing was required. That hearing was held on two dates, February 28, 2014 and March 18, 2014, after which the Court received post-hearing supplemental briefing. In what follows below, the Court has made factual findings where the evidentiary hearing gave it a basis for so doing, and has otherwise taken the facts most favorably to the plaintiffs.

According to the Amended Complaint ("Am. Compl."), in 1934 the late Jewish banker, Mendelssohn-Bartholdy, after nearly two years of "intensifying Nazi persecution had devastated him financially, professionally, and socially," consigned *Madame Soler* to the Berlin

2

art dealer Justin K. Thannhauser, in what was allegedly a

"paradigmatic forced transfer." Am. Compl. ¶¶ 1-2. Thirty years

later, *Madame Soler* remained in the custody of Thannhauser, who had

by then relocated to New York. *See, e.g.*, Am. Compl. ¶ 4.

   In October of 1963, Kurt Martin, the then-Director General of

the State Paintings Collections Munich ("State Paintings

Collection"), an organization operating under the auspices of the

Bavarian State Ministry for Education and Cultural Affairs, *see* Pl.

Ex. 47., sent a letter to the Bavarian State Ministry for Education

and Culture, seeking approval for a trip to the United States by

Halldor Soehner, a Senior Curator in the department of "17th and

18th Century Spanish and French Paintings," *see* Pl. Ex. 33. The

purpose of the trip, according to the letter, was so that Soehner,

who was likely the heir apparent to Martin, could become "familiar

with the most modern methods of museum organization . . . the

systemization of scholarly and public education work, the

administration of museums, the security measures, the purchase and

so forth [of artworks] . . . ." Pl. Ex. 40 (alteration in the

original). On January 10, 1964, Martin's permission for Soehner's

requested trip "to study museums in the USA" was granted by the

Bavarian State Ministry for Education and Cultural Affairs, with the

caveat that "[a] leave of absence beyond 3 months is not possible in

light of the imminent change in the leadership of the State

Paintings Collections." Pl. Ex. 41. On March 30, 1964, Soehner, as

3

Senior Curator, and soon to be Director General of the State Paintings Collections, departed for the United States. Pl. Ex. 43.

The evidence shows that at some point after March but before the end of May 1964, Soehner signed Thannhauser's guestbook in Thannhauser's residence on the Upper East Side of New York, where the two men met and, most likely, Soehner saw *Madame Soler*. Pl. Ex. 44. After returning back to Germany on June 12, 1964, Pl. Ex. 46, Soehner wrote a letter to Thannhauser on July 1, 1964, in which following some fulsome flattery, he states: "[t]oday I entered upon my new position [as Director General], and my first action is this letter to you," and "I would be particularly grateful if you would give me the opportunity to visit you around the first of August." *Id*. While this might have suggested a second trip to New York, actually Soehner was planning to meet Thannhauser in Europe. Thus, on July 22, 1964, Soehner, wrote to the Bavarian State Ministry for Education and Cultural Affairs, declaring that "it has become a matter of urgency for me to take an official trip to St. Jean, Cap Ferrat, France, where important negotiations with the art trade there concerning future purchases for the Bavarian State Paintings Collections are to be conducted." Pl. Ex. 49. On July 23, 1964, in anticipation of such approval, Soehner wrote to Thannhauser stating "[o]ur original plan to meet at the beginning of the month of August can now be realized." Pl. Ex. 50. On July 29, 1964, the Bavarian Ministry officially approved Soehner's trip to France, granting "approval for the official trip of the Director General of the State

Paintings Collections Dr. Halldor Soehner to St. Jean, Cap Ferrat, France to conduct negotiations with the art trade there in the first week of the month of August 1964." Defendant's hearing exhibit ("Def. Ex.") 31.

This phase of the correspondence culminates with a Letter Agreement between Thannhauser and Soehner on August 3, 1964 in "Saint-Jean-Cap-Ferrat," in which Thannhauser dictates, on "Hotel Intercontinental Geneve" letterhead, "I hereby confirm the purchase of the oil painting 'Madame Soler' by Pablo Picasso by the Bavarian State Paintings Collections, Munich, from myself as commission agent. The Purchase price is 1,775,000.00 Swiss Francs . . . the full amount should be paid by August 31, 1965." Def. Ex. 32. The Letter Agreement adds the caveat that "[t]his acquisition is subject to the proviso of consent of the Bavarian State Ministry of Education and Cultural Affairs and the consent of the Purchase Commission for Modern Art with the Bavarian State Paintings Collections in Munich." Id.

Given this factual record, plaintiffs now concede that their original theory that jurisdiction in this Court could be premised on Soehner and Thannhauser reaching a binding agreement regarding the sale of Madame Soler in their Spring 1964 meeting in New York can no longer prevail. March 18, 2014 Transcript ("Tr.") at 370:18-23. Indeed, the Court finds that Soehner and Thannhauser did not reach any kind of agreement during the Spring 1964 visit in New York. The Court further determines that Soehner took no concrete action toward

5

the purchase of *Madame Soler* until after he returned to Germany and took office as Director General in July of 1964.

The Court infers that one reason the Letter Agreement was signed in Europe was Thannhauser's desire to avoid U.S. taxes on the sale. Thus it appears that before final approval of the sale was given by the Bavarian Ministry of Education and Cultural Affairs." Thannhauser – in response to Soehner's request on October 8, 1964 that Thannhauser send a letter to the Bavarian Ministry of Education and Cultural Affairs "communicating willing[ness] to sell" *Madame Soler* "from your collection to the museums in Munich," *id*. – stated that "[t]he paintings are located in Switzerland" and "will be sent to you from there, upon advanced payment of the expenses." Def. Ex. 36.

Further evidence of Thannhauser's tax avoidance motive came on October 23, 1964, when the Picasso painting was sent by the entity "EBA, Vaduz," a Liechtenstein entity controlled by Thannhauser, Pl. Ex. 26, to the Bavarian State Paintings Collections in Munich, Def. Ex. 38, with a letter from EBA informing Soehner of the shipment and asking for confirmation of receipt, Pl. Ex. 58. Final approval of the sale by the Bavarian State Ministry of Culture and Education did not, however, occur until December 1964. Def. Ex. 53, 50. Thereafter, on April 10, 1965, Soehner wrote to Thannhauser that payment would be made to EBA "as requested," Def. Ex. 59, and on June 1, 1965, it was "EBA" that wrote to Soehner acknowledging receipt of payment for *Madame Soler*. Def. Ex. 62.

6

Based on these findings, the Court concludes that jurisdiction over the State of Bavaria does not lie in this action under any of the three exceptions enumerated in the FSIA § 1605(a)(2). The Court considers each of these exceptions in turn:

Under the first prong of FSIA § 1605(a)(2), plaintiffs' suit must be "[1] 'based upon' [2] some 'commercial activity' by [Bavaria] that had 'substantial contact' with the United States." *Saudi Arabia v. Nelson*, 507 U.S. 349, 356 (1993). In no real sense is this suit even "based upon" Bavaria's acquisition of *Madame Soler* in 1964-65, let alone activity in the United States. Rather, as the "Nature of Action" section of the Amended Complaint makes clear, the gravamen of this action is that title to *Madame Soler* never rightfully passed to Thannhauser in Germany because "Mendelssohn-Bartholdy consigned the Painting (to Thannhauser) in 1934 only after nearly two years of intensifying Nazi persecution," Am. Compl. ¶ 2. *See also* Am. Compl. ¶¶ 70-176. Thus, if this action were to ever reach the merits, the focus of the case would be almost exclusively on the circumstances of Mendelssohn-Bartholdy's original sale to Thannhauser in Europe in the 1930's.

To be sure, Bavaria would not be the defendant in the case but for the fact that Bavaria purchased the painting from Thannhauser in 1964. But such "but for" reasoning is insufficient to satisfy the "based upon" requirement. *Transatlantic Shiffahrtskontor GmbH v. Shanghai Foreign Trade Corp.*, 204 F.3d 384, 390 (2d Cir. 2000). Rather, "'based upon' requires a degree of closeness between the

acts giving rise to the cause of action and those needed to establish jurisdiction that is considerably greater than common law causation requirements." *Id.* (citing *Saudi Arabia v. Nelson*, 507 U.S. 349, 357-58 (1993)); *see also Kensington Int'l Ltd. v. Itoua*, 505 F.3d 147, 156 (2007). The blot on Bavaria's title to *Madame Soler*, if there is one, is entirely based on what occurred in Germany in 1934.

Plaintiffs respond by contending that in allegedly "obtaining . . . in [New York] a legally binding offer" to sell *Madame Soler* to Bavaria, Bavaria committed an integral element of conversion under New York law. Plaintiffs' post-hearing brief at 7 (emphasis omitted). *See also Meese v. Miller*, 79 A.D. 2d 237, 436 N.Y.S.2d 496 (4th Dep't 1981) ("Conversion is any unauthorized exercise of dominion of control over property by one who is not the owner of the property which interferes with and is in defiance of a superior possessory right."). Plaintiffs further contend that commercial activity that establishes even *one* part of a single element of a claim is sufficient to satisfy the "based upon" requirement of FSIA § 1605(a)(2).

But even assuming *arguendo* that any of these dubious legal contentions is correct, the argument is factually flawed. For as the Court has already found, there was no legally binding offer to purchase *Madame Soler* made at any time in New York. Indeed, there was nothing more than an initial meeting between Thannhauser and Soehner at which, at most, there was simply an agreement to talk

8

further. Moreover, even if there had been more, Soehner was not yet Director General at the time he visited Thannhauser in New York, and he lacked even apparent authority to make any binding offer.

For similar reasons, even if, contrary to fact, plaintiffs could satisfy the "based upon" requirement of the first exception under § 1605(a)(2), they would still fail to satisfy the further requirement that the events detailed above qualify as "commercial activity carried on by [Bavaria] having substantial contact with the United States." The "substantial contact" inquiry focuses on what *Bavaria did* in the United States. *See, e.g.*, *Santos v. Compagnie Nationale Air France*, 934 F.2d 890, 893 n.3 (7th Cir. 1991). Thus the fact that Thannhauser was a United States resident is wholly irrelevant to the Court's sovereign immunity determination under the first prong of § 1605(a)(2). As has already been made clear, the evidence establishes that the only activity conducted by Bavaria *in* the United States in connection with its acquisition of *Madame Soler* consisted of Soehner's preliminary meeting with Thannhauser in the spring of 1964, a meeting of no legal consequence, which took place months before the occurrence of all the pertinent events – the drafting a letter agreement in France, the shipment of the painting from Vaduz to Munich, the approval of the acquisition in Munich, and the payment for the painting to EBA in Liechtenstein – all of which occurred in Europe. And even if, contrary to the evidence, a bargain for *Madame Soler* had been vetted at the initial New York meeting, an individual preliminary meeting cannot and does not by itself

9

constitute commercial activity "having substantial conduct with the United States" under FSIA §§ 1605(a)(2) and 1603(e). *See, e.g.*, *Gen. Elec. Capital Corp. v. Grossman*, 991 F.2d 1376, 1383-84 (8th Cir. 1993) (finding that a single preliminary meeting in Minnesota in connection with a corporate acquisition in Canada, even when coupled with subsequent exchanges of letters, faxes, and telephone calls in the United States, did not satisfy the requirements of the FSIA).

To support jurisdiction under the second prong of FSIA § 1605(a)(2), plaintiffs' case must be "[1] based . . . upon [2] an act performed in the United States in connection with a commercial activity of [Bavaria] elsewhere." *Kensington*, 505 F.3d at 157. This prong "is generally understood to apply to non-commercial acts in the United States that relate to commercial acts abroad." *Id.* (internal quotation and citation omitted). Where, as here, the plaintiff "has not argued that any *non-commercial acts* performed by [Bavaria] in the United States allegedly formed the basis of its complaint," the second prong is simply "inapplicable." *Id.* (emphasis in original).

Finally, the Court does not have jurisdiction over Bavaria under the third prong of FSIA § 1065(a)(2). This third prong "contains two requirements: (1) there must be an act outside the United States in connection with a commercial activity of [Bavaria] that cause[d] a direct effect in the United States and (2) [plaintiffs'] suit must be based upon that act." *Transatlantic*, 204 F.3d at 388 (2d Cir. 2000). In a vain attempt to satisfy this

10

requirement, plaintiffs posit that Bavaria's purchase of *Madame Soler* even if occurring (as this Court has found) entirely outside the United States, had a supposed series of allegedly "direct effects" on the United States, ranging from "the disastrous effect of Bavaria's commercial misconduct on the policy-sensitive NY art market," to the furtherance of an alleged criminal conspiracy to evade United States taxes. *See* Plaintiffs' post-hearing briefing at 9. This is balderdash. While the Second Circuit has held that "[t]here is no requirement that the [direct] effect be substantial," *Servaas, Inc. v. Republic of Iraq*, 2011 WL 454501 at *2 (2d Cir. 2011), neither the alleged impact on the art market nor the alleged tax evasion are direct effects at all. And the other "direct" effects alleged by plaintiffs, such as the alleged act of conversion or the sale of New York property, have already been found by this Court to be factually unsupported.

For the foregoing reasons, this lawsuit is hereby dismissed for lack of jurisdiction. The Clerk of the Court is directed to enter judgment and to close this case.

SO ORDERED.

Dated:    New York, NY
          June 27, 2014                          JED S. RAKOFF, U.S.D.J.

11

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------X
JULIUS H. SCHOEPS, BRITT-MARIE
ENHOERNING, and FLORENCE VON
KESSELSTATT,

                       Plaintiffs,

       -against-

FREISTAAT BAYERN, or FREE STATE OF
BAVARIA. A STATE OF THE FEDERAL
REPUBLIC OF GERMANY,
                      Defendants.
-------------------------------------------------------------X

```
┌─────────────────────────────────┐
│ USDC SDNY                       │
│ DOCUMENT                        │
│ ELECTRONICALLY FILED            │
│ DOC #: _____          │
│ DATE FILED: _____           │
└─────────────────────────────────┘
```

13 **CIVIL** 2048 (JSR)

**JUDGMENT**

      Defendant Bavaria having moved pursuant to Fed. R. Cic. P. 12(b)(1) to dismiss the action

for lack of subject matter jurisdiction under the Foreign Sovereign Immunities Act, 28 U.S.C. §

1605(a)(2) ("FSIA"), and the matter having come before the Honorable Jed S. Rakoff, United States

District Judge, and the Court, on June 27, 2014, having rendered its Opinion and Order dismissing

this lawsuit for lack of subject matter jurisdiction and directing the Clerk of the Court to enter

judgment and to close this case, it is,

      **ORDERED, ADJUDGED AND DECREED:** That for the reasons stated in the

Court's Opinion and Order dated June 27, 2014, this lawsuit is hereby dismissed for lack of subject

matter jurisdiction and the case is closed.

**Dated:** New York, New York
         June 30, 2014

                          **RUBY J. KRAJICK**

                          Clerk of Court

             BY:

                          Deputy Clerk

THIS DOCUMENT WAS **ENTERED**
ON THE DOCKET ON _____



28 U.S.C.A. § 1605

28 U.S.C.A. § 1605

United States Code Annotated Currentness
Title 28. Judiciary and Judicial Procedure (Refs & Annos)
 Part IV. Jurisdiction and Venue (Refs & Annos)
 Chapter 97. Jurisdictional Immunities of Foreign States

**§ 1605. General exceptions to the jurisdictional immunity of a foreign state**

**(a)** A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case--

• • • • • • •

 **(2)** in which the action is based upon a commercial activity carried on in the United States by the foreign state; or upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States;

28 U.S.C.A. § 1605